IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:16-cv-00848

| | |
|---|---|
| **CARGILL, INCORPORATED,**<br><br>Plaintiff,<br><br>v.<br><br>**WDS, INC.; JENNIFER MAIER; and BRIAN EWERT,**<br><br>Defendants. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT JENNIFER MAIER'S MOTION TO DISMISS** |

Plaintiff Cargill, Incorporated ("Cargill") respectfully submits this Memorandum in Opposition to Defendant Jennifer Maier's ("Maier") Motion to Dismiss ("Motion") (Dkt. No. 19).

## INTRODUCTION

The bottom line is that the Court must deny Maier's Motion because it ignores the allegations of the Complaint, allegations that fully support Cargill's claims as pleaded. Contrary to Maier's effort to couch this as a "simple" contract dispute, Cargill alleges independent tort claims for which culpable corporate officers, owners, or agents—like Maier—are personally liable. Cargill alleges that Maier was at the center of a long and lucrative fraud scheme. As alleged, Maier (a) lied to Cargill about what WDS was paying its vendors, to deceive Cargill into believing these payments were much higher than they were; (b) used these lies as the basis to inflate WDS charges to Cargill; and (c) doctored vendor invoices when Cargill sought substantiation of WDS vendor pricing. Notably, Maier admits falsifying vendor invoices but disputes the harm wrought to Cargill. While this dispute is irrelevant to this 12(b)(6) motion,

which of course tests the strength of Cargill's Complaint, Maier's admission highlights her presumptuousness in seeking to avoid civil prosecution. The Court must deny Maier's Motion.

## BACKGROUND

### A. Cargill's Claims Against Maier

Cargill's alleges four causes of action against Maier: (1) fraud, (2) unfair and deceptive trade practices, (3) conversion of Cargill's monies, and (4) conspiracy. Each finds ample support in Cargill's detailed allegations. These allegations, in summary, are that Maier, as the president and owner of Defendant WDS, Inc. ("WDS"), was at the core of a long-running scheme to overcharge Cargill by lying to it about how much WDS paid vendors. The Cargill-WDS agreements allowed WDS to charge only a specified percentage over what WDS actually paid its vendors. Compl. ¶¶ 9-14.

Cargill alleges that with her individual co-defendant, Brian Ewert ("Ewert"), Maier corrupted these agreements at their heart: by lying to Cargill about what WDS paid its vendors. Compl. ¶¶ 20-23. Once Cargill, suspicious about possible overcharges, asked Maier for vendor invoices, Maier falsified invoices in an effort to throw Cargill off the trail. Compl. ¶¶ 29, 34-35. Cargill's suspicions proved well-founded: Maier ultimately admitted her falsification to Cargill. Motivated by her substantial financial interest in the scheme, Maier's actions were far beyond and distinct from the breach by WDS of its agreements with Cargill that the most basic interpretation of these facts – WDS overcharged Cargill – depicts.

### B. Maier Was at the Core of Defendants' Fraud against Cargill

Cargill pleaded factual allegations that satisfy Rule 9's requirement for "specificity" and demonstrate a *prima facie* case of protracted fraud. *See* N.C. Pattern Instructions – Civil 800.00 (identifying fraud elements). Cargill alleged an ongoing scheme by Maier, her fellow WDS

principal Ewert, and WDS to lie to Cargill about what WDS paid its vendors, with the intent to deceive Cargill into paying WDS far more than its agreed pricing. Compl. ¶¶ 19-25. Cargill reasonably relied on these lies to its detriment and to the benefit of WDS, Maier, and Ewert, paying WDS sums these defendants – but not Cargill – knew violated the agreed formula. Compl. ¶¶ 19-25, 28; Maier Answer ¶ 38; Ewert Answer ¶ 38.

### C. Maier Admits Falsifying Invoices

Seeking to paint sin as virtue, Maier offers her belated confession of invoice fabrication as a basis to dismiss Cargill's claims at the pleadings phase. Maier alleges on her own behalf that "on one occasion in March of 2016, after the product had already been purchased and paid for, this answering Defendant modified vendor invoices, for reasons that have already been explained to Cargill, and no damages resulted therefrom." Maier Answer ¶ 34. While this early Motion is not the point at which the Court need determine Maier's motivations or the magnitude of her wrongdoing, this admission – though remarkable in what it admits – provides only a glimpse at the scope of what Cargill submits discovery and trial will expose.

As an example, Maier is correct that in response to increasing Cargill pressure for copies of underlying vendor invoices to WDS, Maier eventually provided some invoices. Compl. ¶ 32-34; Maier Answer ¶ 32-34. However, she doctored the original invoice pricing, increasing it to make it appear that WDS's fixed fee margin was lower— much lower— than it really was. For example, she falsified a December 28, 2015 invoice, changing its pricing from $174.77 to $226.50 per roll of food-grade plastic film.

- 3 -
Case 3:16-cv-00848-FDW-DSC   Document 31   Filed 02/28/17   Page 3 of 17



(Exhibit A: The original invoice).	(Exhibit B: The falsified invoice).

Using the proper fixed margin of 10% on the original invoice, WDS *should* have charged Cargill $194.19 per roll. WDS *actually* charged Cargill $238.50 per roll, a markup of 36% rather than 10% for an overcharge of $44.33 per roll.



(Exhibit C: Purchase Order with pricing confirmed by WDS).

Worse, Maier next altered the price for the same material to make it appear WDS was *undercharging* Cargill. The above Cargill-to-WDS purchase order, incorporating pricing information supplied by WDS, reflects the $238.50 charge – but if WDS had in fact paid $226.50 per roll, as it falsely asserted, its corresponding charge to Cargill should have been that amount plus 10%. *See* Exhibit B; Maier Answer ¶ 34.

### D. Maier Admits that the Scheme Resulted in Overcharges to Cargill, to Maier's Personal Financial Benefit

Maier admitted that "on some items, prices charged inadvertently exceeded the price called for in the then applicable Agreement." Maier Answer ¶ 36. Ewert makes a similar admission. Ewert Answer ¶ 36. Cargill's Complaint alleges that Maier and Ewert, as the two owners, benefited from the admitted overcharges WDS charged. Compl. ¶ 38; Maier Answer ¶ 38 (admitting she "indirectly benefited" as an owner); Ewert Answer ¶ 38 (same).

### LEGAL STANDARD

Motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure are granted "only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d

324, 325 (4th Cir. 1989). To survive a motion to dismiss, a Cargill must establish only that it has stated a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must deny a motion to dismiss if the complaint "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). In making this determination, the Court must also "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Id.* (internal quotation marks omitted).

## ARGUMENT

As detailed in the subsections below, Maier's Motion fails because: (a) Cargill's Complaint properly alleges "independent tort" claims separate from its breach of contract claims; (b) Maier, as a WDS principal, is personally liable for her own tortious conduct against Cargill; and (c) Maier's efforts to minimize her fraud, in addition to ranging outside the Complaint, only betray the vitality of Cargill's tort claims against her.

**A. Cargill May Purse Maier Individually for "Independent Torts"**

**1. Cargill Has Sufficiently Pleaded "Independent Tort" Claims**

Maier asserts that because the Cargill-WDS relationship was contractual, her conduct in its course, no matter how egregious, cannot support tort claims against her. The assertion flouts clear North Carolina law, which recognizes "independent tort" liability of corporate agents on sufficient allegations. Cargill's allegations in turn depict robust "independent tort" claims against Maier here.

North Carolina courts allow "independent tort" claims brought in a "contract-centered litigation" to proceed where "the tort claims 'are identifiable and distinct from the primary

- 6 -
Case 3:16-cv-00848-FDW-DSC    Document 31    Filed 02/28/17    Page 6 of 17

breach of contact claim.'" *Food Lion, LLC v. Schuster Mktg. Corp.*, 382 F. Supp. 2d 793, 800 (E.D.N.C. 2005) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998)). Claims for fraud, unfair trade practices, and conversion, where otherwise properly pleaded, all survive under the "independent tort" exception. *See id.* (denying motion to dismiss fraud claim); *Metro. Group, Inc. v. Meridian Indus., Inc.*, No. 3:09-cv-440, 2010 WL 5056771, at *5-6 (W.D.N.C. Dec. 6, 2010) (denying motion to dismiss fraud and UDTPA claims); *Bon Aqua Int'l, Inc. v. Second Earth, Inc.*, No. 1:10CV169, 2013 WL 357469, at *9 (M.D.N.C. Jan. 29, 2013) ("Conversion claims may proceed parallel to a breach of contract claim pursuant to North Carolina's independent tort doctrine.").

An independent tort claim exists where "a plaintiff claims 'something more' than a simple dispute over the interpretation and performance of a subject contract." *Metro. Group*, 2010 WL 5056771, at *5. Therefore, "independent torts" exist where a party used fraud to induce another into a contract or to maintain that contractual relationship. *See Food Lion, LLC*, 382 F. Supp. 2d at 800-01; *FDIC v. Mingo Tribal Pres. Trust*, No. 5:13-cv-113, 2015 WL 1646751, at *7 (W.D.N.C. April 14, 2015) ("The wrinkle is that plaintiff has alleged tortious activity not only [in] the performance of the Note, but also in the making of its modifications and the creation of the forbearance agreement."); *Metro. Group*, 2010 WL 5056771, at *5 ("Plaintiff's fraud claim involves more than mere allegations that Defendant failed to perform contractual obligations" because Defendant's representations induced Plaintiff to pay a higher price than it otherwise would have).

For example, in *Food Lion*, a food marketing company alleged that it entered into agreements with a grocery store chain to distribute and promote the company's products. 382 F. Supp. 2d at 795-96. The company alleged that the store not only intentionally failed to do so, in

breach of the agreement, but it also made false representations to induce the defendant into entering into the agreements and continuing to do business with the plaintiff. *Id.* at 800. The court observed "[s]uch alleged behavior goes beyond the scope of the contract." *Id.* at 801.

As in *Food Lion*, this matter involves much more than simple (even if intentional) failure to perform under the agreements. WDS overcharged Cargill on a consistent, ongoing basis over the course of several years while actively working to hide the overcharging. As alleged in the Complaint, WDS, at Maier and Ewert's direction, along with Maier and Ewert individually, "actively conceal[ed] the actual nature of the markups and the excessive nature of the charges." Compl. ¶ 28; *id.* ¶¶ 20-25. In addition, the defendants continued to represent to Cargill that they were performing according to the agreements, in order to secure new agreements and continue to do business with Cargill. Compl. ¶¶ 22-23. Maier's admitted act of falsifying the invoices to hide the previous and ongoing fraud from Cargill caps the pattern of fraudulent acts.

Cargill has pled sufficient factual allegations to demonstrate that Maier's and the other Defendants' actions are "something more" than a simple failure to perform under contract, and Maier's argument should be rejected.

### 2. Maier is Personally Liable for Her Role in These Tortious Acts

Maier acknowledges only two wrongful actions: (1) WDS's breach of contract, and (2) the admitted instance of fraud in falsifying invoices, which she dismisses as of no import. But she ignores the actual allegations in the Complaint outlining the pervasive fraudulent misrepresentations she participated in. She cannot now hide behind WDS's incorporated status to protect her from liability for her torts. *See Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987) ("A corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation.").

### B. Cargill Pleaded Factual Allegations Sufficient to Survive Maier's Additional Miscellaneous 12(b)(6) Claims

#### 1. Cargill Has Pleaded Adequate Factual Allegations of Fraud Against Maier

Maier asserts that the Complaint identified only the invoice falsification with sufficient particularity to meet Rule 9(b)'s requirements. Maier ignores that Rule 9(b) "does not contradict the theory of notice pleading embraced by the Federal Rules in general, and Rule 8, in particular." *Angell v. Kelly*, 336 F. Supp. 2d 540, 549 (M.D.N.C. 2004) (internal quotation omitted); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (stating that courts "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.").

Here, Cargill has pleaded the factual allegations required to sustain a fraud claim against Maier. First, assuming *arguendo* that the only allegation of fraud against Maier was the falsification of invoices, this one instance of fraud *that she admits to* is more than sufficient to state a claim of fraud against her. She minimizes the fraud as "after-the-fact" (Maier Mem. at 12), suggesting she is not liable for the tort because this was a "no harm, no foul" situation. However, Maier's admitted act in falsifying the invoices squarely meets the elements for fraud, as alleged in the Complaint: (1) it was a representation of a material historical fact (*i.e.* what the direct vendor had charged); (2) the misrepresentation was false; (3) Maier knew the representation was false; (4) Maier intended Cargill to rely on the misrepresentation; and (5) Cargill did rely on it, continuing to do business with WDS in a belief in the integrity of its charges. *See Food Lion*, 382 F. Supp. 2d at 797 (outlining elements for a fraud claim); Compl. ¶¶ 29, 34-35, 52-56.

Beyond Maier's hoped-for focus on one or a few invoices, however, Cargill alleged facts sufficient to sustain a far broader claim for fraud against her and the other Defendants. Throughout the relevant time period, Maier: (1) directed and caused WDS personnel to inflate vendor pricing for use on Cargill purchase orders to WDS; (2) misrepresented to Cargill that WDS was providing accurate pricing information in the purchase orders; (3) met with Cargill representatives periodically, in person and by telephone, and misrepresented that WDS was performing according to the terms of the agreements; and (4) happily swept into WDS and her own personal accounts Cargill payments Maier knew to be the product of her own and her confederates' fraud. Compl. ¶¶ 20-25. These misrepresentations gulled Cargill not only into persisting in business with WDS, but into a multi-million dollar, national relationship spanning years and a succession of agreements. *See* Compl. ¶¶ 22, 27; *see also* WDS's Counterclaim ¶ 5.

### 2. Cargill Has Pleaded Adequate Allegations to Support the Unfair and Deceptive Trade Practices Claim Against Maier

The crux of Maier's motion to dismiss Cargill's North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") claim against her is two-fold: (1) it overlaps with the breach of contract claim, and (2) it is premised only on the falsification of the invoices. She unhelpfully cites cases stating that failed breach of contract claims and failed fraud claims cannot support an UDTPA claim. Maier Mem. at 14-15. But as discussed above, these arguments are unavailing; the unfair and deceptive trade practices at issue here find support in independent torts, and separately as claims under the UDTPA itself, separate from the breach of contract.

Cargill has alleged facts demonstrating (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to Cargill.[1] *See* Compl. ¶¶ 19-25,

---

[1] Contrary to Maier's suggestion, courts have not uniformly held that a plaintiff must be a North Carolina entity with in-state injuries to sustain a claim under the UDTPA. *Hardee's Food Sys., Inc. v. Beardmore*, No. 5:96–CV–508–BR(2), 1997 WL 33825259, at *3 (E.D.N.C. June 6,

42-44; *see also* N.C. Gen. Stat. § 75-1.1(a); *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998).

For the first element, North Carolina courts have held that fraud itself constitutes an unfair and deceptive trade practice. *See Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975) ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts."). As noted above, Cargill has alleged sufficient facts to raise a fraud claim, which therefore supports a UDTPA claim. In addition, "[a] practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "Systematically overcharging" inflated prices for goods is considered both an unfair and deceptive practice. *See Sampson-Bladen Oil Co. v. Walters*, 86 N.C. App. 173, 177, 356 S.E.2d 805, 808-09 (1987). Maier's actions here in misrepresenting WDS's pricing and conformance to the agreements, and concealing the fraud by falsifying invoices, are inarguably unethical and unscrupulous, and they did deceive Cargill.

---

1997) (allowing an out-of-state plaintiff to rely on the UDTPA to raise claims against a defendant "based on decisions which [the defendant] made, in all probability, in North Carolina"). The key is that the plaintiff suffer injuries as a result of the "defendant's in-state activities." *Id.*; *Jacobs v. Cent. Transp., Inc.*, 891 F. Supp. 1088, 1111-12 (E.D.N.C. 1995) (concluding that a foreign plaintiff could sue a North Carolina defendant over foreign injuries having an in-state impact on North Carolina commerce), *aff'd in relevant part, rev'd in part*, 83 F.3d 415 (4th Cir. 1996). Here, Maier, as majority owner of WDS, a company she incorporated in and maintains as a North Carolina entity, engaged in wrongful conduct through WDS in North Carolina. *See Market Am., Inc. v. Rossi*, No. 1:97CV00891, 1999 WL 1939247, at *17 (M.D.N.C. Apr. 15, 1999) (finding a "sufficient nexus" to North Carolina to apply the UDTPA where some of the unfair and deceptive conduct "occurred in North Carolina"). Maier's wrongful in-state conduct harmed Cargill. Thus, Maier cannot escape the reaches of the UDTPA.

Moreover, Cargill has sustained a "substantial in-state injury" to support its UDTPA claim. Unlike the cases cited by Maier, Cargill engages in substantial commerce in North Carolina, in addition to the rest of the country. The defendants' deceptive and fraudulent trade practices substantially affected this business activity and caused injury to Cargill in North Carolina.

Maier's unfair and deceptive actions "affected commerce," the second element. Commerce includes "an activity involving an exchange of some type in which a participant could be characterized as a seller." *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716 (4th Cir. 1983) (quotation omitted). When determining if the commerce definition is met, the "proper inquiry is not whether a contractual relationship existed between the parties, but rather whether the defendants' allegedly deceptive acts *affected* commerce." *J.M. Westall & Co. v. Windswept View of Asheville, Inc.*, 97 N.C.App. 71, 75, 387 S.E.2d 67, 69 (1990). Here, Cargill purchased product from WDS, a North Carolina entity. WDS—at the direction of its owners and officers—unfairly and deceptively marked up its charges to Cargill; Cargill paid these fraudulent charges; and these fraudulently inflated charges in turn affected Cargill's pricing to customers such as Walmart, with operations in North Carolina, thereby affecting Cargill's commerce in the state.

Maier's unfair and deceptive actions therefore injured Cargill's business, including in North Carolina. Cargill's profits directly stem from consumers, including those in North Carolina. Defendants' actions in causing Cargill to overpay for products harmed both Cargill and its North Carolina consumers, in contravention of N.C. Gen. Stat. § 75-1.1. *See Sara Lee Corp. v. Carter*, 351 N.C. 27, 32, 519 S.E.2d 308, 311 (1999) ("After all, unfair trade practices involving only businesses affect the consumer as well." (quotation omitted)).

The Court should therefore reject Maier's attempt to frame Cargill's proper UDTPA claim as a simple contract claim or one based on insufficient fraud allegations and deny Maier's motion to dismiss.

### 3. Cargill Has Pleaded Adequate Allegations to Support the Conversion Claim Against Maier

As background, Cargill has properly pleaded the prima facie elements of conversion: (1) until the time Defendants came into possession of Cargill's moneys, Cargill was its lawful owner and was entitled to its immediate possession; and (2) Defendants converted Cargill's moneys to their own use. *See* N.C. Pattern Instructions-Civil 806.00; Compl. ¶¶ 45-50. The same alleged events that support the above causes of action support Cargill's conversion claim over the specific sums of money at issue. In arguing Cargill's conversion allegations are insufficient (as to dominion over the moneys and as to demand for the moneys), Maier ignores the Complaint and the nature of this case.

Given the facts of this case and Defendants' blatant efforts to cover up their ongoing scheme, Maier's "demand" argument defies common sense: first, until a fraud victim is aware of its being defrauded, a demand for a return of its funds of course cannot follow. Next, as soon as Cargill obtained proof of its fraud and conversion suspicions, it repeatedly demanded Defendants' accounting, invoices, and underlying data, from Defendants and Maier in particular. Despite Defendants' obstruction—including in asking vendors to falsify invoices and in actually falsifying invoices—Cargill continued to investigate, measure its losses, and seek the return of Defendants' fraud proceeds. Similarly, Maier's one-sentence claim that Cargill did not plead her "dominion" over the moneys comes from the same kitchen sink of routine arguments as the one above, both baseless in light of this case's facts and Maier's direct participation and leadership in the fraud. *See* Compl. ¶¶ 3, 7-39, 45-50, 58-61. Maier has not shown entitlement to relief on her motion.

### 4. Cargill Has Pleaded Adequate Allegations to Support the Conspiracy Claim Against Maier

In its Complaint, Cargill has sufficiently stated a civil conspiracy claim against Maier under North Carolina law. Although there is no independent cause of action for civil conspiracy, a plaintiff can bring the claim "where there is an underlying claim for unlawful conduct." *Byrd v. Hopson*, 265 F. Supp. 2d 594, 599 (W.D.N.C. 2003). "To state a civil conspiracy claim under North Carolina law, a plaintiff must allege 'a conspiracy, wrongful acts done by certain of the alleged conspirators, and injury.'" *Champion Pro Consulting Group, Inc. v. Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 720 (M.D.N.C., 2013) (quoting *Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984)). The unlawful conduct underlying the conspiracy can overlap with another claim; a plaintiff need only allege a separate agreement to commit that unlawful conduct. *See id.* ("Because the unfair methods of competition claim survives and the Amended Complaint alleges that Defendants had an agreement to commit the acts underlying those claims, the Amended Complaint adequately states a claim for civil conspiracy.").

Cargill's Complaint alleges facts regarding the multiple forms of Maier's "unlawful conduct": her unfair, deceptive, fraudulent misrepresentations that induced Cargill into paying the fraudulent markups and continuing the business relationship. *See* Compl. ¶¶ 19-25, 28-29, 34, 59. In addition, Cargill alleged a conspiracy between Maier and others to commit that unlawful conduct. *Id.* ¶ 59. Maier's assertion that Cargill simply "suggests that defendants [] conspired" (Maier Mem. at 18) ignores the lengthy list of factual allegations Cargill offers of the "overt acts" Maier engaged in with the others to conspire against Cargill. *See* Compl. at ¶ 60. The Court should thus deny Maier's motion on this ground.

### C. Cargill Has Suffered Damages Attributable to Maier's Tortious Actions

Maier argues with conspicuous cheek that Cargill "has not suffered any damages as a result of [her] alleged conduct." Motion at 1. Taking Cargill's allegations as true, Maier was central to a long-running scheme to collect unlawful payments from Cargill. Discovery will illuminate its consequences, but the scheme and its multiple independent torts undoubtedly harmed Cargill in an amount exceeding $75,000.00. *See* Compl. ¶¶ 39, 44, 50, 57, 61. Indeed, the Court may fairly wonder why Maier went to the trouble of falsifying invoices at all, if – as she now argues – there was no pattern of overcharges and corresponding overpayments to camouflage. Put simply, Maier's assertion that Cargill's liability allegations, however lurid, depict harmless conduct by Maier deserves scant attention by this Court.

### CONCLUSION

For the above reasons, the Court should deny Maier's Motion to Dismiss.

Dated: 28th day of February, 2017.

> */s/ Edward F. Hennessey IV*
> Edward F. Hennessey IV
> N.C. Bar No. 15899
> thennessey@robinsonbradshaw.com
>
> Fitz E. Barringer
> N.C. Bar No. 42679
> fbarringer@robinsonbradshaw.com
>
> **Robinson, Bradshaw & Hinson, P.A.**
> 101 North Tryon Street, Suite 1900
> Charlotte, NC 28246
> Telephone: 704-377-2536
> Facsimile: 704-378-4000

and

**FAEGRE BAKER DANIELS LLP**

Jacob D. Bylund (admitted *pro hac vice*)
Jacob.Bylund@FaegreBD.com
Dasha Ternavska (admitted *pro hac vice*)
Dasha.Ternavska@FaegreBD.com
801 Grand Avenue, 33rd Floor
Des Moines, IA, 50309-8011
Telephone: 515-248-9000
Facsimile: 515-248-9010

Christine R. M. Kain (admitted *pro hac vice*)
Christine.Kain@FaegreBD.com
2200 Wells Fargo Center, 90 S. Seventh Street
Minneapolis, MN, 55402
Telephone: 612 -766-8743
Facsimile: 612-766-1600

*Attorneys for Cargill Cargill, Incorporated*

## WORD COUNT CERTIFICATION

I hereby certify, subject to Fed. R. Civ. Proc. 11, that, as reported by word processing software, the foregoing Memorandum (omitting the case caption and any certificates of counsel) complies with the word limitation set forth in the applicable orders of this Court.

*/s/ Edward F. Hennessey IV*
Edward F. Hennessey IV
N.C. Bar No. 15899

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to the following:

>Jeffrey S. Southerland
>Denis E. Jacobson
>Richard W. Andrews
>Tuggle Duggins P.A.
>P.O. Box 2888
>Greensboro, NC 27402
>jsoutherland@tuggleduggins.com
>djacobson@tuggleduggins.com
>randrews@tuggleduggins.com
>*Attorneys for Defendants WDS, Inc. and Brian Ewert*

>Andrew A. Freeman
>Alan M. Ruley
>Bell, Davis & Pitt, P.A.
>P.O. Box 21029
>Winston-Salem, NC 27120-1029
>afreeman@belldavispitt.com
>aruley@belldavispitt.com
>*Attorneys for Defendant Jennifer Maier*

Dated: February 28, 2017                   */s/ Edward F. Hennessey IV*
                                                                  Edward F. Hennessey IV