UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:16-cv-00848-FDW-DSC

| | |
|---|---|
| CARGILL, INCORPORATED; CARGILL MEAT SOLUTIONS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> WDS, INC.; JENNIFER MAIER; and BRIAN EWERT, <br><br> Defendants. | SECOND AMENDED COMPLAINT <br><br> (JURY DEMAND) |

Plaintiffs, Cargill, Incorporated ("Cargill"), and Cargill Meat Solutions Corporation ("CMS") (collectively "Plaintiffs"), for their Second Amended Complaint ("Complaint") against the Defendants WDS, Inc. ("WDS"); Jennifer Maier ("Maier"); and Brian Ewert ("Ewert") (collectively "Defendants"), state as follows:

**THE PARTIES**

**1.**     Plaintiff Cargill is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wayzata, Minnesota.

**2.**     Plaintiff CMS, a wholly owned subsidiary of Cargill, and its affiliate, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wichita, Kansas.

**3.**     WDS is a corporation organized and existing under the laws of the State of North Carolina, with a principal place of business in Charlotte, North Carolina.

**4.**     Maier is an owner and the President of WDS.  Maier is a citizen of the State of South Carolina and resides in Lake Wylie, South Carolina.

**5.** Ewert is an owner and is, or was at times relevant to this Complaint, the Vice-President of WDS. Ewert is a citizen of the State of North Carolina and resides in Charlotte, North Carolina.

## JURISDICTION AND VENUE

**6.** The Court has subject matter jurisdiction over this case because Plaintiffs are completely diverse from each Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a)(1). Additionally, this Court has jurisdiction over this action arising under the laws of the United States under 28 U.S.C. § 1331.

**7.** Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965.

## FACTS APPLICABLE TO ALL COUNTS

### *A. Cargill Strategic Sourcing*

**8.** At times relevant to this Complaint, Cargill operated through Business Units. Cargill's Business Units included but were not limited to Cargill Case Ready, Cargill Beef, Cargill Food Distribution, Cargill Pork, and Cargill Value Added Meats.

**9.** Groups of Business Units formed Platforms, with the aforementioned Business Units falling within the Cargill Animal Protein Platform.

**10.** Finished goods processed and prepared by the Cargill Animal Protein Platform are distributed throughout the United States, including distribution to North Carolina.

**11.** Cargill's various Business Units operated within Cargill or within Cargill subsidiaries and affiliates, like CMS. At times relevant to this matter, the above mentioned Business Units were part of Cargill subsidiary and affiliate CMS.

12.     At times relevant to this Complaint, Cargill also utilized groups of shared services personnel, who provided services across multiple Business Units and subsidiaries. Cargill referred to these groups of shared services personnel as a Function, with the various Functions operating above and across the Business Units and subsidiaries

13.     At times relevant to this Complaint, Strategic Sourcing was a Function within Cargill. Among other purposes, Strategic Sourcing sought to optimize Cargill's spending for indirect and direct non-raw materials and services, which include but are not limited to packaging products and distribution services.

14.     At times relevant to this Complaint, Strategic Sourcing was responsible for the negotiation, implementation, and monitoring of Select Supplier Agreements, through which Cargill and its affiliates, including CMS, procured indirect and direct non-raw materials.

15.     At times relevant to this Complaint, Select Supplier Agreements were executed by Cargill and explicitly and directly cover Cargill's affiliates, including subsidiaries like CMS. Cargill's Select Supplier Agreements are executed for the express benefit of Cargill and its affiliates, including CMS.

16.     The Select Supplier Agreements further provide that Cargill has the right to indemnification from any counterparty for its failure to perform pursuant to the terms of a Select Supplier Agreement.

17.     Prior to negotiating a Select Supplier Agreement with Cargill, potential counterparty/suppliers were provided with a written notice explaining that the Select Supplier Agreement simplifies the manner by which Cargill and its affiliates purchase products and services from suppliers.

18. The written notice further explains that the Select Supplier Agreements eliminate the need for affiliate-specific ancillary agreements.

19. At times relevant to this Complaint, Cargill's affiliates, including CMS, procured indirect and direct non-raw materials and services through Select Supplier Agreements negotiated by the Strategic Sourcing Function and executed by Cargill for the benefit of Cargill and its affiliates, including CMS.

20. At times relevant to this Complaint, now former Cargill employee Michael Kennedy was within the Strategic Sourcing Function.

21. Kennedy's titles included Strategic Sourcing Director for the Cargill Animal Protein Platform. Kennedy was the most senior Strategic Sourcing Function professional within the Wichita, Kansas, headquarters of CMS.

22. Kennedy supervised the Strategic Sourcing professionals who were responsible for negotiating, implementing, and monitoring certain Select Supplier Agreements.

23. At times relevant to this Complaint, now former Cargill employee Shawn Nguyen was within the Strategic Sourcing Function.

24. Nguyen's titles included that of Strategic Sourcing Procurement Center Manager.

25. Nguyen was responsible for supervising the buying supervisors, also called Senior Buyers, within the Wichita, Kansas, Strategic Sourcing Function.

### B. The Agreements

26. At times relevant to this Complaint, WDS was a supplier of indirect and direct non-raw materials and services.

27. Indirect non-raw materials include items such as personal protective equipment for plant personnel or pallet wrap, used to secure boxes of products to a pallet for shipment.

Direct non-raw materials include items such as the film, pads, and trays used to package meat products. Services include distribution, which includes warehousing and logistics.

28.    At times relevant to this Complaint, WDS was not a manufacturer of indirect and direct non-raw materials. WDS purchased the products from the product's manufacturer and distributed the products. The manufacturers of the products are referred to as Vendors.

29.    Prior to the start of the relationship between Plaintiffs and Defendants, Cargill had entered into a non-exclusive Select Supplier Agreement with another distributor ("Competitor Distributor") of indirect and direct non-raw materials and services.

30.    Pursuant to the Select Supplier Agreement with Competitor Distributor, Competitor Distributor would secure products from Vendors and distribute them to Plaintiffs in exchange for an 11% fixed margin, calculated as Vendor's invoiced cost divided by .89.

31.    Per the Select Supplier Agreement, Cargill had the right to audit Competitor Distributor, to confirm compliance with the Select Supplier Agreement.

32.    Prior to the start of the relationship between Plaintiffs and Defendants, and during the term of the below defined Agreements, Cargill had also entered into Select Supplier Agreements with certain Vendors.

33.    Cargill's Select Supplier Agreements with Vendors established the prices to be paid by Cargill and its affiliates, for direct purchases, or for purchases through distributors, like Competitor Distributor, purchasing from a Vendor for distribution to Cargill or its affiliates.

34.    In 2009, Defendants offered to enter into a Select Supplier Agreement with Cargill and its affiliates, including CMS, in exchange for a 10% fixed margin, calculated as Vendor's invoiced cost divided by .90.

35.     Defendants also held WDS out as a certified woman owned business, with Maier as the majority owner and President. Because of the more favorable pricing terms offered by Defendants, and WDS's status as a registered diverse business, Cargill and its affiliates began migrating the distribution business away from Competitor Distributor to WDS.

36.     Cargill and its affiliates, including CMS, and WDS first entered into a Select Supplier Agreement in September 2009, renewing it in 2012 and 2015 (collectively, "the Agreement" or "the Agreements").  The Agreements enumerated specific pricing terms for the products and services WDS would provide.

37.     CMS, as an affiliate of Cargill pursuant to the Agreements, was an intended and direct beneficiary of the Agreements. In addition to the clear terms of the Agreements as to participation by Cargill affiliates, including CMS, the Defendants specifically understood that most of the processing plants to be serviced pursuant to the Agreements were operated by CMS and through several of the Business Units noted above.

38.     CMS's claims in connection with this matter, as outlined in this Complaint, arise out of the same transactions, occurrences, and series of transactions and occurrences as do the claims of Cargill. The Defendants' tortious and unlawful conduct was directed at Cargill and its affiliates, including CMS.

39.     CMS's claims in connection with this matter and those of Cargill, as outlined in this Complaint, involve common questions of law and fact.

40.     CMS is not a party to any separate and distinct agreement with WDS related to the product purchases at issue in this case.  All orders placed by CMS for the products that are the subject of this Complaint were placed pursuant to and are governed by the Agreements.

41. Under the Agreements, WDS was to charge Plaintiffs only (a) the amount WDS itself paid the Vendor, plus (b) a specified percentage of the direct Vendor price, the fixed margin.

42. Consistent with its Select Supplier Agreements generally, and its agreement with Competitor Distributor, Plaintiffs had the right to audit WDS to confirm compliance with the Agreements.

43. For the initial 2009 Agreement, all products were to be priced at Vendor's invoiced cost divided by .90, one-tenth (roughly 1%) better than the fixed margin applied by Competitor Distributor for the same products and services.

44. For the 2012 and 2015 Agreements, additional categories of products were added, reducing the mark-up for some products but retaining the highest available markup level at Vendor's invoiced cost divided by .90.

45. At all times relevant to this Complaint, the Defendants understood that the highest available markup pursuant to the Agreements was Vendor invoiced cost divided by .90 or, in the parties' terminology, a 10% markup.

46. Defendants communicated this understanding to Cargill on numerous occasions, reassuring Cargill that WDS had not and did not charge Cargill more than the 10% markup.

47. As one example, on March 11, 2016, under direct and specific questioning, Maier communicated to several Cargill Strategic Sourcing personnel that WDS had "never" charged Cargill and its affiliates more than the 10% markup permitted by the Agreements.

48. The integrity of the Agreements and these terms depended on WDS's integrity in communicating the Vendor invoiced cost and the resulting representation of the margin applied.

49.     Plaintiffs relied upon WDS, Maier, and Ewert to correctly report the Vendor invoiced cost.

50.     The 2012 and 2015 Agreements also included volume rebate, cost savings, and other performance metric terms.

51.     Without limitation, as an example, WDS agreed to prepare a monthly report detailing sales to Cargill by Business Unit and cost savings by Business Unit.

52.     Records of individual transactions clearly identify the Business Unit involved and the associated entity, be it Cargill or CMS.

53.     The 2012 and 2015 Agreement rebate terms tracked spend by Cargill and all Cargill affiliates, including CMS, to arrive at a monthly volume total. As total spend with WDS increased, Cargill's rebate percentage under the 2012 Agreement would increase from 0.5% to 2%, when monthly sales exceeded $10 million per month.

54.     The rebate program incentivized Cargill and its affiliates including CMS to purchase products through WDS, in order to obtain a higher rebate.

55.     The rebate and cost savings terms, which aggregate across all Cargill affiliates, are consistent with the pre-execution notices Cargill provided to the Defendants regarding Cargill's Select Supplier Agreements, including the Agreements.

56.     As stated above with respect to these written notices generally, the Defendants received a written notice from Cargill explaining that Cargill's Select Supplier Agreements simplified the procurement process, eliminating the need for affiliate-specific ancillary agreements.

57.     During the term of the 2012 and 2015 Agreements, Cargill and WDS tracked spending by Cargill and its affiliates, including CMS, measuring spend by Business Unit and tabulating the rebates due to Cargill by WDS.

58.     During the term of the 2012 and 2015 Agreements, no matter which Business Unit, or which affiliate, placed the order with WDS, Cargill issued the ACH payment to WDS for the order.

59.     Stated differently, Cargill issued the payments to WDS for the products purchased by Cargill and its affiliates, including payments for orders made by CMS. Personnel with Cargill's Accounting Function would then apply the costs back across the applicable Business Units.

60.     As reflected by the negotiation of the Agreements, the terms of the Agreements, and the parties' performance, Defendants understood that purchases of products by Cargill and its affiliates, including CMS, from WDS were purchases pursuant to the Agreements.

61.     Regardless of which Cargill affiliate placed an order by issuing a purchase order to WDS, the purchase was under and subject to the Agreements.  Defendants knew and understood this to be the case at the time of the events at issue.

62.     Regardless of which Cargill affiliate placed an order by issuing a purchase order to WDS, the ACH payment was made by Cargill.  Defendants knew and understood this to be the case at the time of the events at issue.

### C.  Role of Kennedy and Nguyen

63.     As noted above, now former Cargill employee Kennedy was the senior most Strategic Sourcing Function professional within the Wichita, Kansas, headquarters of CMS.

64.     Kennedy supervised the Strategic Sourcing professionals who were responsible for negotiating, implementing, and monitoring the Select Supplier Agreements, including the WDS Agreements.

65.     Kennedy was, among other things, responsible for training other Strategic Sourcing personnel with respect to Cargill's Code of Conduct, including Cargill's gifts and anti-bribery policies, among other related policies.

66.     Kennedy was also responsible for determining whether or not a particular Vendor should be under a direct Select Supplier Agreement with Cargill, to establish the prices to be paid by Cargill, its affiliates and Cargill's distributors, in connection with products purchased from that Vendor.

67.     Kennedy also supervised the Strategic Sourcing professionals who were responsible for monitoring performance and initiating pricing audits of WDS, per the Agreements, and was responsible for determining what steps, if any, would be taken in connection with an audit.

68.     Kennedy was also responsible for increasing Cargill's total spend with registered minority and women-owned businesses, as WDS represented itself to be.

69.     As noted above, Nguyen was responsible for supervising the buying supervisors, also called Senior Buyers, within the Wichita, Kansas, Strategic Sourcing Function. Nguyen had direct supervision with respect to the buyers responsible for placing orders for products from WDS.

70.     Throughout the course of the relationship between Plaintiffs and the Defendants, including the complete term of the Agreements, Maier and Ewert offered and Kennedy and

Nguyen received items of value, including money, to influence their actions and that of Cargill and CMS.

71.     The bribery of Kennedy and Nguyen, and others, by Maier and Ewert was systematic, according to a fixed plan, and was methodical.

72.     Under the arrangement, Maier, as President of WDS, arranged for WDS to pay substantial "commissions" to Ewert and other entities associated with Ewert and/or Maier. With her as the majority owner of WDS, the "commissions" had the effects of decreasing Maier's distribution and of Maier and Ewert equally bearing the burden of the gifts, payments, and other consideration described herein.

73.     Under the arrangement, Maier and Ewert, through other businesses they operated, including operation with Jim Maier, Maier's husband, including DLP and others identified below, also paid substantial "commissions" to Ewert and other entities associated with Ewert and/or Maier.

74.     Having received the monies at Maier's direction and with her participation and cooperation, Ewert next moved the monies through various entities and accounts in order to transfer monies and other consideration to Kennedy and Nguyen, among others.

75.     To conceal their arrangement, which was ongoing throughout the course of the Agreements, the Defendants communicated with Kennedy and Nguyen and others through private emails, shared email accounts, texts, instant messages, and other applications and means.

76.     The Defendants also communicated with Kennedy and Nguyen through private and undisclosed meetings. Documents produced to date reflect substantial withdrawals of money by Ewert prior to in-person meetings.

77. Kennedy and Nguyen both utilized multiple personal email addresses—and accounts shared with Ewert—to communicate regarding the arrangement. Code names were also routinely used in the communications in an effort to further conceal the true nature and purpose of the communications.

78. During the term of the Agreements and prior, Kennedy and Nguyen communicated with Maier and Ewert through @cargill.com email accounts as though such communications constituted the substantive discussion between the parties, but the actual substantive discussions, regarding the arrangement and relationship, occurred through means of communication not visible to Plaintiffs.

79. Maier and Ewert intended to and did in fact influence the actions of Kennedy and Nguyen, through their improper and unlawful actions, preventing Plaintiffs' discovery of the arrangement devised and perpetrated by Ewert and Maier.

80. Kennedy and Nguyen, through private means of correspondence, advised the Defendants as to the negotiation of the Agreements with Cargill. Kennedy and Nguyen also privately advised the Defendants as to aspects of the performance of the Agreements and opportunities for other of the Defendants' affiliated entities, as identified below.

81. Kennedy and Nguyen actively concealed information, such as actual vendor pricing, from other Cargill Strategic Sourcing professionals in an effort to conceal the actual markups that the Defendants were charging Cargill and its affiliates.

82. While withholding this information from their fellow Cargill employees, Kennedy and Nguyen provided the Defendants with confidential internal information, such as pricing and agreements from WDS's competitors, so that the Defendants could maximize WDS's overcharges of Cargill and its affiliates and/or so they could appear to remain competitive.

83.     Kennedy and Nguyen also used their positions within Strategic Sourcing to increase the total volume of business Cargill did with WDS or its affiliates.  Both instructed Cargill employees to purchase products through WDS despite their knowledge that WDS was overcharging Cargill under the Agreements.  Nguyen, at least, also lied to certain vendors by telling them that the only way they could sell their products to Cargill was through WDS.  Yet none of the Agreements required that Cargill exclusively purchase any products through WDS.

84.     On more than one occasion during the term of the Agreements, Cargill personnel other than Kennedy or Nguyen raised questions and concerns regarding the Defendants, their pricing and practices.

85.     When these concerns were presented to Kennedy or Nguyen, Kennedy or Nguyen would dismiss the concerns. In certain instances, the Defendants would provide responses to inquiries from Cargill personnel, and Kennedy or Nguyen accepted the responses, even though they knew the information was incorrect.

86.     As an example, in one instance from 2014, a Cargill Strategic Sourcing professional, who reported to Kennedy, requested copies of Vendor invoices from Maier. The production of the Vendor invoices would have revealed that WDS was charging Plaintiffs substantially more than the fixed margin specified by the Agreements for certain products.

87.     Maier conferred with Ewert as to the response to the inquiry, and Ewert communicated with Kennedy about the same, through private means of communication. Maier and Ewert then jointly drafted a response to the inquiring Cargill employee, copying her supervisor, Kennedy, and claiming that the prices in question had been in error, that the error was attributable to a misapplication of freight charges, and offering a small credit.

88.     Kennedy used his position and influence to end the inquiry without Cargill having obtained the Vendor invoices. In addition to the other consideration he received, Kennedy was rewarded for his efforts approximately one month later, with an all-expenses paid yacht trip in the Caribbean totaling nearly $200,000, paid for by Ewert and Maier, through the arrangement discussed above.

89.     In another example, a plant level buyer questioned the prices for certain products supplied by WDS, noting that the prices appeared to be available for less from other sources. At Ewert's request, Kennedy intervened, halting further evaluation of the matter.

90.     In still another example, a senior buyer, reporting directly to Nguyen, questioned the prices being charged by WDS. The buyer was summoned to Kennedy's office, for a meeting with Kennedy and Nguyen, during which she was berated and directed to focus on her job, not the job of others.  After the meeting, the senior buyer stopped questioning the pricing.

91.     The examples could continue. Ewert and Maier, through the arrangement described above, paid for influence, and their investment was fruitful. For years, they were able to procure extraordinary gains from the relationship with Cargill and its affiliates, including CMS, using the unlawful arrangement described above.

### D.  Third Party Involvement - Customers

92.     Maier and Ewert's plan and arrangement also extended beyond Plaintiffs and their employees Kennedy and Nguyen, to Plaintiffs' customers, including "Customer X"—a customer of the Cargill Case Ready Business Unit, among other Business Units.

93.     Case Ready products are prepared in meat processing plants and are packaged individually for display at retail locations.

**94.** In some instances, the retailer/customer will establish specifications for the case ready products. These specifications can include directives regarding the types of packaging products to be used, including trays, pads, scavengers, film and labels.

**95.** Using the same means described above, Maier and Ewert offered and a Customer X employee received items of value, including money, to influence the actions of Customer X.

**96.** Specifically, the Customer X employee receiving the bribes was responsible for establishing specifications for the case ready products sold at Customer X, including those prepared by the Cargill Case Ready Business Unit.

**97.** With Maier's cooperation and necessary participation, Ewert made substantial payments to the Customer X employee in order to get Customer X to require processors, including Cargill and CMS, to direct business back to Ewert and Maier-affiliated businesses, including WDS and DLP.

**98.** As to the Customer X employee, Ewert withdrew cash and sent the payment to the employee, via mail or FedEx, on what appears to have been a monthly basis. Ewert and the Customer X employee spoke in code, with the employee repeatedly inquiring as to when his "samples" would arrive so that he could pay his personal bills.

**99.** Through the same arrangement described above, Ewert and Maier similarly paid for lavish trips for the Customer X employee, just as they did for then-Cargill employees Kennedy and Nguyen.

**100.** The payments Maier and Ewert arranged for the Customer X employee do not appear anywhere in the formal books and records of the companies they operated. However they were characterized for purposes of the actual accounting records, the payments were clearly made.

101. Similarly, the payments to Nguyen and Kennedy do not appear or are not evident in the formal books and records of the companies Maier and Ewert operated. As was the case with the payments to the Customer X employee, the payments were off the books and/or recorded as some other payment or expense.

102. Because Maier and Ewert, using the means describe above, were similarly offering items of value, including money, to Plaintiffs' employees, including Kennedy and Nguyen, the extraordinary prices associated with the products were not challenged, enriching Maier and Ewert.

103. On information and belief, Customer X was unaware of the arrangement and the actions of its employee. Customer X sold the associated products to its customers, including, on information and belief, sales from stores located in North Carolina, in which Customer X has a number of locations.

104. Plaintiffs continue to investigate whether other customers were similarly involved in the arrangement perpetrated by Maier and Ewert.

### E. Third Party Involvement - Vendors

105. Maier and Ewert's plan and arrangement extended further still, to influencing the actions and conduct by Vendors and employees of Vendors.

106. At least one Vendor known as of this date was issuing direct payments to Ewert in connection with sales of products from WDS to Cargill.

107. In other words, rather than negotiate with the Vendor for the best price and then apply the contracted-for margin as required by the Agreements, Ewert negotiated payments for himself, escalating the Vendor invoiced cost and passing the higher cost through to Plaintiffs.

**108.**     In the case of at least two Vendors identified to date, at Ewert's explicit direction, employees of the Vendor misrepresented the actual Vendor invoiced cost in communications to Plaintiffs in order to conceal the actual amount being paid by WDS.

**109.**     Cargill and its affiliates' relationship with WDS was not exclusive. As to any product, Cargill could have gone directly to the Vendor to purchase the item or purchased the item through another distributor, including the Competitor Distributor. By involving Vendors, at least two of which are known, Maier and Ewert further ensured that Cargill would not learn of the true prices being paid by WDS, the actual Vendor invoiced cost.

**110.**     Employees of the Vendors at issue appear to have appreciated the Defendants overcharging arrangement and took steps to further the arrangement, suggesting their actions and behaviors had been influenced in a way similar to that of Kennedy, Nguyen and the Customer X employee.

**111.**     Plaintiffs' investigation as to the role of third parties, including employees of third parties, continues.

### F.  Role of Defendants' Employees and Agents

**112.**     Maier and Ewert did not act alone. Maier's husband, Jim Maier, was particularly involved in the matters discussed in this Complaint, especially in the monitoring and establishment of the markups on the products sold to Cargill and its affiliates. Other officers of WDS and senior personnel also participated, at least in part, in the arrangement.

**113.**     WDS utilized standard accounting software, including QuickBooks and NetSuite. In addition to the WDS employees, Maier and Ewert also engaged non-employee accountants and more than one accounting firm, to assist with their financial matters.

114.    Maier, Ewert, and WDS's officers and senior personnel knew and tracked the margins that were generated on sales of products to Plaintiffs. They could easily identify, and routinely did identify, WDS's cost of goods sold and the associated margin dollars and margin percentages.

115.    At the same time, Maier, Ewert, and WDS's officers and senior personnel knew the terms of the Agreements. They knew what is clearly stated in the Agreements and what the Defendants have repeatedly acknowledged (prior to this lawsuit)—that WDS was not to charge Cargill more than a 10% markup, Vendor invoiced cost divided by .90.

116.    Maier, Ewert, and the other WDS officers and senior personnel also understood that the terms of the Agreements applied to all of Cargill's affiliates, including CMS.  WDS's internal documents and tools used to establish pricing included two categories: "Cargill" and "non-Cargill."  They did not distinguish between business units or affiliates of Cargill when setting prices.

117.    In addition, Maier, Ewert, and the other WDS officers and senior personnel had the ability to consistently and accurately set product prices in accordance with the Agreements. On certain products that the Competitor Distributor also sold, WDS established procedures to price those products correctly under the Agreements because Defendants knew that Cargill would identify any overcharges by comparing their prices with those of the Competitor Distributor.

118.    Maier, Ewert, and other WDS officers and senior personnel knew that WDS was overcharging Plaintiffs, in violation of the Agreements.  Separately, WDS officers and senior personnel took direction from Maier and Ewert to make misrepresentations to Plaintiffs and conceal the facts.

119. Maier and Ewert were explicit with their personnel. If Cargill personnel started asking questions about pricing, the issue was supposed to be elevated to their attention for the response.

120. When Cargill personnel questioned the prices on film products, for example, those questions were referred to Ewert. Funneling the questions to Ewert allowed him to frame the responding misrepresentation and to call upon Kennedy or Nguyen to assist with resolution of the issue.

121. In December 2015, after personnel reorganization within Cargill's Strategic Sourcing Function that reduced Kennedy's control over the WDS relationship, Cargill issued a formal 40-item audit request to WDS.

122. In response to the December 2015 audit request, the WDS officers immediately turned to their regular accounting reports and highlighted the products as to which WDS was charging more than 10%. At Ewert and Maier's direction, the senior WDS team began lowering prices on certain products, while refusing to produce information on others, asserting confidentiality.

123. Defendants fed information back to Cargill in controlled installments, starting with the lowest charges, in an effort to prevent Cargill's discovery of their scheme.

124. The response of Maier and Ewert, as well as the WDS team, to the December 2015 audit was not an isolated event; it was the way Maier and Ewert directed their personnel to conduct business—engage in misrepresentations and, when questioned, evade and deflect.

### G. Defendants' Misrepresentations in the Purchase Order Request Process

125. Maier and Ewert's misrepresentations and practices infected the day-to-day transactions between Cargill and its affiliates and WDS.

126. To manage its inventory at various locations for various Business Units in the relevant time period, Plaintiffs issued purchase order requests to WDS for the goods governed by the Agreements, on an as-needed basis.

127. In issuing the purchase order requests, Plaintiffs used the amount WDS previously charged for the same requested products and then asked WDS to confirm that pricing for the new order.

128. In response to Plaintiffs' requests, WDS would make one of two types of statements: it would either (a) confirm the pricing on the purchase order request, or (b) change the pricing on the purchase order request, before sending it back to Plaintiffs. In cases involving a change by WDS, the transaction would proceed pursuant to the WDS-modified price.

129. In making such statements to Plaintiffs, WDS, directed by Maier and Ewert, represented to Plaintiffs that WDS correctly applied fixed margins to actual direct Vendor prices.

130. These representations by WDS to Plaintiffs were often materially untrue.

131. Maier and Ewert caused WDS to overcharge Plaintiffs, in many cases marking up products several times the permitted fixed margin, and did so consistently over a period of many years and throughout the term of the Agreements.

132. At the time it made these purchase order representations to Plaintiffs, the Defendants knew them to be untrue.

133. At the time the Defendants received payment for the purchased products, Defendants knew that the payments were the product of misrepresentations.

134. When Defendants later communicated with Plaintiffs regarding the parties' relationship, including the reports noted above and alleged "savings" provided by Defendants, Defendants engaged in further misrepresentations.

**135.** Over the course of the parties' relationship, Plaintiffs relied on these misrepresentations: it issued purchase orders for the goods, engaging in the individual transactions with WDS, with the express understanding and reliance that each price charged was calculated in accordance with the then-applicable Agreement and from the actual Vendor price.

**136.** WDS, directed by Maier and Ewert, caused WDS personnel to mark up the WDS pricing beyond the proper fixed margin, knowing that Plaintiffs would rely upon the pricing confirmation.

**137.** WDS, directed by Maier and Ewert, caused WDS personnel to confirm or modify incorrect purchase order request pricing, knowing that Plaintiffs would rely upon the confirmation.

**138.** Plaintiffs relied upon the representations of WDS, Maier, and Ewert, with respect to the correct application of the margin, as part of continuing to do business with WDS. The continuation of the business relationship with WDS worked to the direct benefit of Maier and Ewert, owners of WDS.

**139.** Based on the representations by Maier and Ewert that WDS was providing the agreed-upon pricing in its purchase order request confirmations, coupled with the other actions described above, Plaintiffs continued the relationship with WDS.

### H. Defendants' Misrepresentations in the Process of Entering Into Additional Agreements

**140.** Each time WDS renewed and amended the Agreements with Plaintiffs, Defendants made additional material misrepresentations.

**141.** Namely, Defendants represented to Cargill both that WDS had properly performed under the prior Agreement version, and that WDS intended to perform properly under the subsequent Agreement version.

**142.** At the time they made these Agreement-focused representations, Defendants knew them to be untrue.

**143.** Through each of these misrepresentations, WDS induced Plaintiffs to continue the relationship with WDS each time a new version of the Agreements was signed.

**144.** For example, in connection with the negotiation of the 2012 Agreement, Cargill Strategic Sourcing professionals asked that WDS (a) identify a list of Vendors with spend detail and (b) disclose whether WDS was receiving any rebates from Vendors.

**145.** In response to the pre-2012 Agreement inquiry, Maier and Ewert falsely stated that WDS was not receiving rebates from Vendors. At the time, discovery has revealed, Ewert was receiving direct payments from at least one Vendor.

**146.** Moreover, less than one month earlier, WDS had entered into an agreement with one of its largest Vendors that included a four-percent rebate on certain products, nearly half of the ten-percent maximum markup that WDS would be entitled to under the upcoming 2012 Agreement.

**147.** In response to the pre-2012 Agreement inquiry, Maier and Ewert also falsified business records to misidentify the Vendors and the associated Cargill spend per Vendor. Rather than provide the actual authentic record, Maier and Ewert, with the assistance of the WDS CFO Ramey Millet, prepared a false and fabricated record.

**148.** The falsification of the Vendor list and associated sales was purposeful, and through the falsification, Ewert and Maier were able to conceal two of the Vendors associated with the greatest overcharges.

**149.** Later during negotiations of the 2012 Agreement, Maier and Ewert falsely represented to Cargill employees that WDS would pass on savings from the Vendor-

manufacturers as they were realized by WDS. Discovery has since revealed that WDS would routinely receive price decreases from manufacturers and, at the explicit direction of Maier and Ewert, not reduce WDS's prices on those products to Cargill, thereby charging Cargill more than the maximum markup allowed by the Agreements.

150.    In 2015, in connection with the negotiation of the 2015 Agreement, Ewert and Maier again falsified business records, again aided by WDS CFO Millet.

151.    Specifically, as a part of the 2015 Agreement negotiation, Cargill requested that WDS provide a breakdown of sales by category, allowing Cargill to identify the margin by category and the weighted average margin—across all products purchased.

152.    Ewert and the CFO Millet, presumably with the knowledge and approval of Maier as President, created a fabricated sales record, showing false sales data by category and reflecting a weighted average markup of 7.81%. Ewert emailed that to Cargill.  The actual weighted average markup was more than double this figure, as established by other WDS business records.

153.    The Defendants knew that Cargill would rely upon the 7.81% weighted average markup representation in evaluating whether to continue the relationship with WDS. Had the Defendants provided accurate information, it would have exposed the overcharges under the 2012 Agreement and ended the relationship.

154.    Defendants' conduct in causing WDS to overcharge Plaintiffs was the same before and after signing the 2012 Agreement and its amendments. It did not matter what the Agreement provided, Ewert and Maier had developed an arrangement to systematically remove monies from Cargill and its affiliates, including CMS, and the arrangement continued unabated across the entire term of the Agreements.

**155.** Defendants induced Plaintiffs to sign the 2015 Agreement, knowing that Defendants had not performed as required by the 2012 Agreement or its amendments and that they would not do so in the future.

### I. *Maier and Ewert's Record Falsification*

**156.** Maier and Ewert's actions in falsifying business records in connection with the negotiation of the 2012 and 2015 Agreements were not isolated instances.

**157.** Maier, in particular, has herself falsified material documents using computer software. In the above example related to the 2012 Agreement, Maier appears to have used Microsoft Excel to create and/or falsify a record of sales by Vendor.

**158.** In a prior instance, from 2011, Maier fabricated and backdated an alleged agreement with Cargill, a document to which Defendants continue to point and rely upon in connection with this case. In other words, the Defendants continue to hold out as authentic a document that was clearly and obviously fabricated by Maier, on Ewert's request.

**159.** According to Defendants, as reflected by sworn interrogatory responses, the alleged agreement was executed in February of 2011 and relates to certain categories of products, as to which Defendants engaged in substantial overcharging.

**160.** The metadata associated with the alleged February 2011 agreement, however, as well as recently produced documents, including previously withheld communications, confirm that Maier falsified the document whole cloth, pulling it together from pieces of other documents. She did so at Ewert's direction. Ewert reached out to Kennedy for his assistance on the same, too, via private messages.

**161.** Another example of record falsification relates directly to the commercial bribery of Kennedy and the rebate payments due Cargill under the 2012 Agreement.

162.     As noted above, Cargill was entitled to substantial rebate payments connected to the volume of purchases by Cargill and its affiliates.

163.     WDS and Cargill both tracked the rebate payments and, notably, purchases by CMS were clearly included in the tabulations.

164.     As a result of the arrangement with Kennedy, however, the rebates for the 2012 Agreement were never paid.

165.     Instead, Ewert and Maier directed the preparation of an unused inventory report, purporting to show product inventory that had been paid for by WDS in response to alleged requests by Cargill, but never received or paid for by Cargill .

166.     When the unused inventory report did not show enough value to offset the rebate payment, Ewert directed senior WDS personnel to falsify the report, to add unused inventory that did not exist.  WDS personnel did so.

167.     Armed with the falsified inventory report, Defendants requested that Cargill release WDS from the rebate payment that was due, as an offset. The request went to Kennedy, whom the Defendants were bribing pursuant to the arrangement described above, and Kennedy signed an agreement releasing the rebate obligation in June 2015.

168.     Within a month, in addition to whatever monies Kennedy received in connection with the arrangement described above, Kennedy and Ewert again went on a yacht trip around the Caribbean, with all expenses—expenses in excess of $150,000—paid using the arrangement discussed above.

169.     Ewert and Maier's *magnum opus* as to the falsification of records occurred in March 2016, when under pressure to produce Vendor invoices to verify WDS charges, Maier generated over one hundred false invoices.

170.     In connection with the March 2016 falsification, Maier first prepared a spreadsheet, showing what was actually charged and what "should have been charged" by WDS per the Agreements. She then used this spreadsheet and a program believed to be Adobe to manipulate the prices stated on actual Vendor invoices.

171.     Before sending the falsified invoices, however, Maier took an additional step, seeking written assurance from the Vendor that the Vendor would not disclose the actual invoices or costs to Cargill.  This evidences Maier knew what she was doing was wrong,  and was endeavoring to ensure she did not get caught.

172.     Maier then sent the falsified documents to Cargill via email, purporting to address Cargill's concerns as to overcharging. Within a month, the Vendor at issue confirmed that the invoices had been falsified, ultimately leading to the unravelling of Maier and Ewert's scheme.

173.     In a related incident, during the same period, Ewert asked the Vendor to generate false invoices so that Defendants could provide false invoices with inflated costs to Cargill, to address the same concern and questions. The Vendor refused and has described the exchange under oath in a deposition taken in this matter.

174.     Metadata from other documents similarly suggest manipulation and falsification. As to still more documents, including documents scanned from physical files, given the pattern and practice of record falsification by Maier and Ewert, it can be difficult to identify what is a legitimate record and what is a fabrication.

175.     Defendants' fabrication of documents had an overarching purpose. Over the course of the relationship, the term of the Agreements, Maier and Ewert used the fabrication of records as a means to convey false information in furtherance of the arrangement and scheme described in this Complaint.

- 26 -

**176.** Defendants falsified and altered other records, including expense reports, in order to conceal the scheme and deduct the associated cost for tax purposes.

### J. Defendants' Regular Misrepresentations in the Course of the Parties' Relationship

**177.** WDS personnel, including Maier and Ewert, also periodically met, in person and by phone, with Plaintiffs' personnel to discuss the parties' relationship.

**178.** During these meetings, WDS personnel, including Maier and Ewert, made material savings-related representations to Plaintiffs they knew to be untrue.

**179.** For instance, in those regular and routine meetings, Defendants represented that WDS was performing pursuant to the parties' then-existing Agreement.

**180.** WDS, Maier, and Ewert made material misrepresentations to Plaintiffs about the proper pricing throughout the relevant time period.

**181.** Similarly, in those regular and routine meetings, Defendants made presentations to Plaintiffs regarding the savings WDS purportedly created for Plaintiffs and regarding the savings WDS purportedly would create for Plaintiffs in the future.

**182.** In making those presentations, Defendants knowingly made material misrepresentations to Plaintiffs.

**183.** Defendants made similar misrepresentations related to performance and savings via email.

### K. Maier- and Ewert-Affiliated Entities' Involvement

**184.** WDS was not the only means used by Maier and Ewert to remove monies from Cargill and its affiliates during the term of the Agreements.

**185.** During the term of the Agreements, Ewert and Maier formed and/or controlled other entities to do so, including, without limitation, entities known as DLP, ARMM, Resnex,

RFS, DVD Services, JIT/Midwest Label, and B-Pak for the purpose of conducting business with Cargill and its affiliates and/or padding WDS's margins.

186.     Each Ewert and Maier affiliated entity was purportedly engaged in businesses in some way related to packaging products.

187.     DLP, for example, purportedly made labels for packages. Resnex purports to have sold certain film used in packaging, and B-Pak offered scavengers, an item used as a part of packaging.

188.     Defendants often instructed WDS employees (several of which were shared with their other entities) to hide or keep secret the connection of such entities with WDS and with Ewert and Maier.

189.     Using their influence with Kennedy, Nguyen, and persons like the compensated employee of Customer X, Ewert and Maier were generally able to secure the approval of Cargill for purchases of products from the entities noted above.

190.     Resnex provides an example. Resnex is not a Vendor, it does not make film or other packaging products. Under the arrangement/scheme, WDS sourced film from a Vendor and instead of selling the film to Cargill at the margin specified in the Agreements, WDS "sold" the film to Resnex at a substantial markup and then Resnex sold the film to Cargill and its affiliates.

191.     Kennedy and Nguyen, in their positions within Strategic Sourcing, were in a position to approve Resnex as a supplier to Cargill. Resnex was established as a tool to generate excess margins, while sidestepping a direct purchase through WDS.

192.     DLP is another example. From recently produced records, Maier and Ewert would influence customers, like Customer X, to specify the use of labels from DLP. Maier and Ewert also used the influence method described above as to Kennedy and Nguyen.

193.     DLP apparently generated substantial margins that were then used, in part, to fund the arrangement/scheme described in this Complaint. Correspondence with Kennedy suggests that Kennedy may have had a direct interest in DLP, akin to or an actual ownership interest, for which he received consideration.

194.     B-Pak is another example. Just as Maier and Ewert's arrangement as to WDS was unwinding, in 2016, Kennedy and Nguyen began pushing for the approval of a new entity, B-Pak, to supply scavenger equipment and scavengers.

195.     Kennedy and Nguyen did not disclose that Ewert was affiliated with B-Pak, but this fact was uncovered during the supplier approval process, because of the increased scrutiny caused by developments in the WDS relationship, and Cargill did not contract with B-Pak.

196.     Again, Ewert and Maier regularly coached WDS personnel (many of which were shared with their other entities) to deny any connection between WDS and the entities noted above. If asked, the employees were supposed to state that the entities were not related to WDS or the individual Defendants and that they were just sharing certain warehousing space or sharing other similar resources.

197.     Within Cargill, Kennedy and Nguyen echoed the direction of Maier and Ewert regarding the separate nature of the entities. Even though Kennedy and Nguyen knew of the interrelated nature of DLP or B-Pak and WDS, for example, they would represent to other Cargill personnel that the entities were separate companies.

### L.  Kennedy and Nguyen Deny Relationship

198.     Plaintiffs had discovered Maier and Ewert's efforts to falsify Vendor records by early May 2016.

199.     Kennedy was interviewed as to his role and signed a statement. In his statement, Kennedy denied having any non-Cargill connections to or relationship with Ewert.

200.     Nguyen was also interviewed as to his role and signed a statement. In his statement, Nguyen denied having any non-Cargill connections to or relationship with Ewert.

201.     Kennedy and Nguyen concealed their relationship with Maier and Ewert and their affiliated entities for many years.

202.     In May 2016, Kennedy and Nguyen signed false statements as to their relationships with Maier, Ewert, and their affiliated entities.

203.     In fact, Kennedy and Nguyen had substantial personal and business connections to Ewert in particular.

204.     As noted above, documents obtained by Plaintiffs indicate that Kennedy had an ownership or other similar interest in DLP. Additional documents show some form of interest being devised to Kennedy by Ewert as to WDS and another Ewert entity, ODDS.

205.     Additional documents obtained by Plaintiffs indicate that Nguyen and Ewert conducted business with Cargill through an entity called Bay with the assistance of ARMM, another Ewert-affiliated entity.

206.     Other documents establish a connection between Ewert and Mr. and Mrs. Gatley, including through the joint ownership of Cargill supplier Midwest Label.

207.     At the same time, Kennedy was engaged in business with the Gatleys and later acquired substantial real estate, valued in excess of $1 million, from the Gatleys in 2014.

208.     Ewert and Maier used their connections with Kennedy and Nguyen to influence Cargill and CMS, to the benefit of Ewert and Maier and to the material detriment of CMS and Cargill.

**209.** Discovery related to the nature and extent of the relationship between Maier, Ewert, Kennedy, and Nguyen is ongoing.

### M. Pervasiveness of the Arrangement/Scheme

**210.** Ewert's relationship with Kennedy and Nguyen pre-dates the Agreements. Maier's involvement, directly and through her husband Jim Maier, also pre-dates the Agreements.

**211.** Ewert and Maier's arrangement to overcharge Cargill and its affiliated entities, fully developed and expanding over the course of the 2009 Agreement and continuing throughout the term of the 2012 and 2015 Agreements, was a pervasive web of false statements, intentional concealment, and commercial bribery.

**212.** Thousands of individual transactions are at issue involving thousands of misrepresentations made by or at the direction of Maier and Ewert. The extent of the transactions and misrepresentations are too voluminous to enumerate in a pleading.

**213.** In connection with written discovery issued by Defendants in this case, Defendants have issued and Plaintiffs have responded to contention interrogatories requesting a detailing of the facts related to misrepresentations by Defendants.

**214.** In total, Plaintiffs' written responses to such discovery exceed several hundred pages, with responses to interrogatories detailing misrepresentations totaling dozens of pages.

**215.** Through this Complaint, Plaintiffs have undertaken to summarize and fairly plead conduct on the part of Defendants, which was pervasive and extensive, and lasted for a period comprising nearly a decade.

216.     To the extent Defendants seek additional facts and details, Defendants are further referred to Plaintiffs' written discovery responses, including to the contention interrogatories propounded by Maier, which responses are fully incorporated herein by this reference.

### N.  Profits of the Fraud and Commercial Bribery Remain with Defendants

217.     In 2016, Cargill retained an accounting firm to audit WDS's performance under the Agreements. The initial audit, which covered the period April 1, 2013, to April 30, 2016, revealed over $26 million in overcharges.

218.     WDS contemporaneously prepared its own report detailing the overcharges and conceding millions of dollars in overcharges in connection with the Agreements.

219.     Despite Plaintiffs' demands, Defendants have not repaid Plaintiffs the overcharged amounts.

220.     Defendants, including Maier and Ewert as owners of WDS, benefitted from the overcharges.

221.     Defendants, and Maier and Ewert specifically, took possession of the profits of their fraudulent arrangement.

222.     Through discovery, in October 2017, WDS granted Cargill access to accounting records for the period prior to April 1, 2013.

223.     As to the 2012 and 2015 Agreements, WDS overcharged Cargill and its affiliates, including CMS, a sum in excess of $35,177,269 plus interest.

224.     The above sum does not account for other damages, including charges by Resnex, DLP, and other entities, which will be further developed in discovery.

225.    From their creation of WDS through 2016 and including, without limitation, the use of follow-on entities like DLP, Resnex, RFS, and B-Pak, Ewert and Maier's commercial bribery arrangement has improperly and unlawfully enriched Maier and Ewert.

226.    Ewert and Maier have been unjustly enriched by their fraudulent actions, including the commercial bribery arrangement discussed above.

227.    Cargill and CMS are entitled to restitution and disgorgement from Maier and Ewert in an amount equal to, at least, the gains Maier and Ewert received in connection with the arrangement/scheme and including gains from each of their affiliated entities so involved.

228.    Discovery is ongoing and Cargill and CMS reserve the right to adjust this figure.

## COUNT I – UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATIONS
### (Against WDS, Maier, and Ewert)

229.    Plaintiffs incorporate the Paragraphs above as though set forth fully herein.

230.    Defendants committed unlawful acts in violation of N.C. Gen. Stat. § 75-1.1 that were unfair and deceptive.

231.    They did so by, without limitation, engaging in a pattern of egregiously and willfully misrepresenting to Plaintiffs the sums owed, and misleading Plaintiffs as to the margins charged, on the products WDS supplied to Plaintiffs.

232.    They did so by, without limitation, making other misrepresentations causing Plaintiffs to continue its relationship with WDS.

233.    They did so by, without limitation, engaging in commercial bribery with Plaintiffs' employees, employees of Plaintiffs' customers, and potentially others.

234.    The did so by, without limitation, influencing the actions of Cargill personnel to expand and develop business with other entities affiliated with the Defendants, for the purpose of securing additional ill-gotten monies from the Plaintiffs.

**235.** Defendants' actions were immoral, unethical, and unscrupulous.

**236.** Defendants' willful and knowing actions had the capacity and tendency to deceive and mislead, created the likelihood of deception, and did in fact deceive Plaintiffs.

**237.** Defendants' unfair and deceptive actions were in and affecting commerce.

**238.** The Defendants realized the gains of their scheme and arrangement in the state of North Carolina, the state into which Cargill issued ACH payments for the products at issue.

**239.** The Defendants formalized their scheme and arrangement in the state of North Carolina.

**240.** The Defendants utilized professionals licensed in the state of North Carolina, including, without limitation, multiple accountants, in effectuating the scheme and arrangement.

**241.** The harm extended to not only Plaintiffs, but also the ultimate consumers in North Carolina.

**242.** The products supplied by the Defendants, generally described as packaging materials, were incorporated into finished products for sale across the country, including sales in North Carolina.

**243.** Defendants' actions proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

**COUNT II – CONVERSION**
**(Against WDS, Maier, and Ewert)**

**244.** Plaintiffs incorporate the Paragraphs above as though set forth fully herein.

**245.** Through misrepresentations, WDS overcharged Plaintiffs by specific and identifiable sums that were in excess of proper product margins.

**246.** Through commercial bribery, Defendants received substantial financial gains and profits. These gains by the Defendants were at the direct expense of the Defendants.

247. Until the time Defendants wrongfully came into possession of said sums of money, Plaintiffs were their lawful owner and was entitled to their immediate possession.

248. Plaintiffs sent WDS said sums on the overcharges by wire transfer from Cargill's account to WDS's account.

249. Plaintiffs sent other entities affiliated with Maier and Ewert monies, a product of the commercial bribery scheme described herein.

250. Defendants converted said sums to their own use and retained them despite Plaintiffs' demand for same.

251. Defendants' actions proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

## COUNT III – FRAUD
### (Against Maier and Ewert)

252. Plaintiffs incorporate the Paragraphs above as though set forth fully herein.

253. By confirming or changing the pricing on Plaintiffs' Purchase Order Requests, Defendants made false representations of, and concealed, past and existing material facts, including the amounts of the fixed margins and the direct prices of the vendors.

254. Defendants made other false representations as described above.

255. Defendants engaged in commercial bribery with respect to Plaintiffs' employees, at least one employee of a customer and likely others.

256. Defendants' commercial bribery arrangement resulted in numerous misrepresentations by Defendants and the persons they influenced and controlled, including the persons who were being bribed.

257. Defendants' misrepresentations were reasonably calculated to deceive Plaintiffs.

**258.** Defendants' misrepresentations were made with the intent to deceive Plaintiffs and with the intent that Plaintiffs act upon them, overpay WDS, and continue to overpay it.

**259.** Defendants' misrepresentations did in fact deceive Plaintiffs.

**260.** Plaintiffs' reliance on the representation was reasonable.

**261.** Defendants' actions proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

**COUNT IV – CONSPIRACY**
**(Against WDS, Maier, and Ewert)**

**262.** Plaintiffs incorporate the Paragraphs above as though set forth fully herein.

**263.** Defendants conspired and entered into agreement with each other, and others known and unknown—including Kennedy and Nguyen, to commit unfair and deceptive acts, to convert Plaintiffs' monies, to defraud Plaintiffs, to breach WDS's contract with Plaintiffs, and to otherwise make misrepresentations to Plaintiffs so as to induce it to overpay WDS and to continue its relationship with WDS.

**264.** Defendants took overt actions in furtherance of the conspiracy, including by setting up the fraudulent overcharges, by renewing Agreements they knew WDS would continue to breach, by engaging in commercial bribery, by asking a Vendor to falsify invoices, by submitting to Plaintiffs falsified invoices, and by taking steps to hide the fraudulent overcharges after Plaintiffs' inquiry.

**265.** Defendants' actions proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

**COUNT V – BREACH OF CONTRACT**
**(Against WDS)**

**266.** Plaintiffs incorporate the Paragraphs above as though set forth fully herein.

**267.** Cargill, including its subsidiary and affiliate CMS, and WDS formed a contract in 2009 and renewed it in 2012 and 2015.

**268.** Plaintiffs performed their obligations under the contracts.

**269.** WDS breached the parties' contracts by charging for goods it supplied to Plaintiffs more than the fixed margins prescribed by the parties' contracts.

**270.** WDS further breached the parties' contracts by failing or refusing to make payment to Plaintiffs for the overcharges Plaintiffs incurred.

**271.** Defendants' actions proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

**272.** All conditions precedent to this claim have been performed, have occurred, or have been excused.

## COUNT VI – VIOLATIONS OF THE U.S. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### (Against Ewert and Maier)

**273.** Plaintiffs incorporate the Paragraphs above as though set forth fully herein.

**274.** Defendants Ewert and Maier are each a person within the meaning of RICO and 18 U.S.C. § 1961.

### A. *Pattern of Racketeering Activity*

**275.** The following acts of racketeering began by at least 2009 and continued through at least 2016, and form a pattern of continuous and interrelated racketeering activity within the meaning of RICO and section 1961.

**276.** Maier and Ewert engaged in commercial bribery in violation of NC GS § 14-353 when they gave or offered gifts or gratuity to Kennedy and to Nguyen, doing so in furtherance of Defendants' fraudulent scheme and with intent to influence Kennedy's and Nguyen's actions in

relation to Plaintiffs' business with WDS, DLP, Resnex, B-Pak, and other Defendant-affiliated entities as detailed in this Complaint, and doing so repeatedly and as frequently as monthly between at least 2009 and 2016, by **(a)** mailing cash or cash equivalents to Kennedy and/or Nguyen via mail or FedEx across state lines, **(b)** delivering to them cash or cash equivalents in person, and/or **(c)** sending them and their families on numerous vacations and trips—including **(1)** a February 13, 2013, in-person delivery by Ewert to Kennedy of a payment or gratuity, referred to as a "Valentine" by Ewert in a text message, in Atlanta, Georgia; **(2)** a July 9, 2013, in-person delivery by Ewert to Kennedy of a payment or gratuity at a hotel, for which Ewert encouraged Kennedy to bring a briefcase or a bag in a text message; **(3)** a March 2014 Disney trip worth approximately $17,000 for Kennedy and his family; **(4)** a June 2014 vacation in the British Virgin Islands worth approximately $140,000 for Kennedy and his family; **(5)** a July-August 2014 Florida trip worth approximately $7,000 for Nguyen; **(6)** a May 2015 Florida trip worth approximately $7,000 for Nguyen; **(7)** a June 2015 vacation in Turks & Caicos and the Bahamas worth approximately $200,000 for Kennedy and his family; and **(8)** a March-April 2016 trip to Colorado worth approximately $12,000 for Kennedy and his family. Each such instance violated NC GS § 14-353.

277.     Between at least 2009 and 2016, Michael Kennedy and Shawn Nguyen engaged in commercial bribery in violation of NC GS § 14-353 when they accepted or requested cash or cash equivalent bribes, vacations and trips, and other gifts or gratuity from Maier, Ewert, and WDS, under an agreement and / or with an understanding that Kennedy and Nguyen shall act for the benefit of WDS, DLP, B-Pak, Resnex, Midwest Label, or other Defendant-affiliated entities, in relation to Plaintiffs' business—including when Kennedy and Nguyen accepted each of the

bribes, payments, vacations, or trips detailed in the paragraph above. Each such instance violated NC GS § 14-353.

278. Ewert engaged in commercial bribery in violation of NC GS § 14-353, when he gave or offered gifts or gratuity to Customer X's employee in furtherance of Defendants' fraudulent scheme and with intent to influence the employee's actions in relation to Customer X's business with DLP and other Defendant-affiliated entities and with Plaintiffs, repeatedly and roughly monthly between at least 2009 and 2015, by **(a)** mailing to him via mail or FedEx across state lines or **(b)** delivering to him in person, cash or cash equivalents—including bribes totaling approximately $5,500–9,000/month in or around **(1)** July 2010 via mail, **(2)** July 2011, **(3)** October 2011 via mail, **(4)** August 2013, **(5)** September 2013 via mail, **(6)** October 2013 via mail, **(7)** December 2013 via mail, **(8)** January 2014 via mail, **(9)** February 2014, and **(10)** January 2015. Each such instance violated NC GS § 14-353.

279. Between at least 2009 and 2015, Customer X's employee engaged in commercial bribery in violation of NC GS § 14-353 when he accepted or requested cash or cash equivalent bribes, or other gifts or gratuity, from Ewert and Ewert's agents under an agreement or with an understanding that he shall act for the benefit of DLP, WDS, or other Defendant-affiliated entities, in relation to Customer X's business with Plaintiffs—including when Customer X's employee accepted each of the bribes detailed in the paragraph above. Each such instance violated NC GS § 14-353.

280. Ewert transported, transmitted, or transferred in interstate commerce securities or money of the value of $5,000 or more, knowing the same to have been converted or taken by fraud and through Defendants' fraudulent scheme against Plaintiffs, when he bribed Customer X's out-of-state employee as detailed in paras. 92–103 and 278–279 above, repeatedly and

roughly monthly between at least 2009 and 2015, by **(a)** mailing to him via mail or FedEx across state lines, or **(b)** delivering to him in person cash or cash equivalents of the value of $5,000 or more—including each of the instances detailed in para. 278. Each such instance violated 18 U.S.C. § 2314.

281. With Defendants having devised a scheme or artifice to defraud Plaintiffs, and to obtain money by means of false or fraudulent representations from Plaintiffs as detailed in this Complaint, each such instance of commercial bribery involving U.S. mail or FedEx was for the purpose of executing such scheme or artifice or attempting to do so in violation of 18 U.S.C. § 1341—including the bribes mailed to Customer X's employee in or around July 2010, October 2011, September 2013, October 2013, December 2013, and January 2014 as detailed above. Each of these instances violated 18 U.S.C. § 1341.

282. Customer X's out-of-state employee received or possessed securities or money of the value of $5,000 or more, which had crossed a State boundary after being unlawfully converted or taken from Plaintiffs as part of Defendants' fraudulent scheme, when he received bribes from Ewert as detailed in paras. 92–103 above, repeatedly and roughly monthly between at least 2009 and 2015, by receiving via mail or FedEx from across state lines or in person cash or cash equivalents of the value of $5,000 or more—including bribes totaling approximately $5,500–9,000/month in or around July 2010, July 2011, October 2011, August 2013, September 2013, October 2013, December 2013, January 2014, February 2014, January 2015, as detailed in para. 278. Each such instance violated 18 U.S.C. § 2315.

283. With Defendants having devised a scheme or artifice to defraud Plaintiffs and to obtain money by means of false or fraudulent representations as detailed in this Complaint, Ewert and Maier did transmit and cause multiple agents to transmit by means of wire in interstate

commerce writings and emails for the purpose of executing such scheme or artifice or attempting to do so, in violation of 18 U.S.C. § 1343—including **(a)** in mid-November 2011, Maier emailing Plaintiffs' employee Julie Shipman false statements claiming WDS had no rebate programs with vendors and materially misrepresenting Plaintiffs' Vendor spend, to induce Cargill's renewal of the Agreement in 2012; **(b)** in early August 2015, Ewert emailing Plaintiffs' employee Patrick Graf a false statement misrepresenting Plaintiffs' annual spend by product category under the Agreements, Cargill's renewal of the Agreement in 2015; and **(c)** in late March 2016, Maier emailing Plaintiffs' employee Asheesh Choudhary 118 falsified Vendor invoices she altered herself, to prevent Plaintiffs' discovery of Defendants' fraudulent scheme. Each instance violated 18 U.S.C. § 1343.

284. With Defendants having devised a scheme or artifice to defraud Plaintiffs and to obtain money by means of false or fraudulent representations as detailed in this Complaint, Ewert and Maier did transmit or cause WDS employees to transmit by means of wire in interstate commerce emailed purchase order confirmations containing overcharges and other misrepresentations, for the purpose of executing Defendants' scheme or artifice or attempting to do so, in violation of 18 U.S.C. § 1343—including each instance of overcharging detailed in Plaintiffs' November 3, 2017, Expert Report's Exhibit 10, which exhibit is nearly 2,000 pages long. Each instance violated 18 U.S.C. § 1343.

285. With Defendants having devised a scheme or artifice to defraud Plaintiffs and to obtain money by means of false or fraudulent representations as detailed in this Complaint, and for the purpose of executing such scheme or artifice or attempting to do so, Ewert and Maier did cause Cargill to transmit by means of wire in interstate commerce payments to WDS on inflated charges and to other Defendant-affiliated entities, in violation of 18 U.S.C. § 1343—including

each instance of overcharging detailed in Plaintiffs' November 3, 2017, Expert Report's Exhibit 10, which exhibit is nearly 2,000 pages long. Each instance violated 18 U.S.C. § 1343.

286.     Ewert and Maier obstructed justice and corruptly destroyed or concealed records and documents, or attempted to do so, with intent to impair their integrity or availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(c)(1) when they concealed or attempted to conceal text messages, chats, emails, and other communications with Michael Kennedy, Shawn Nguyen, Customer X's employees, and others in neither disclosing their existence, nor producing them at any point in 2017, with intent to impair their availability for use in this federal action, which text messages, chats, emails, and other communications have been since obtained by Plaintiffs on the Order of this Court and show Defendants' acts in furtherance of their scheme to defraud Plaintiffs.

287.     Ewert and Maier obstructed justice and influenced or impeded this official proceeding, or attempted to do so, in violation of 18 U.S.C. § 1512(c)(2), when they held out in this action, including in sworn discovery responses, as (a) legitimate and (b) helpful to their defense a purported 2011 Cargill agreement, despite knowing that Maier created and falsified said agreement in or around October 2011, backdating it to February 2011 at Ewert's direction and with Kennedy's assistance, and in furtherance of Defendants' scheme to defraud Plaintiffs.

### B.  Violations of 18 U.S.C. § 1962(a)

288.     Ewert and Maier each received income and/or proceeds derived, directly and/or indirectly, from the pattern of racketeering activity and resulting growth of their entities' relationships with Plaintiffs as detailed above.

289.     From 2008 and through 2016, Ewert and Maier each used and/or invested, directly and/or indirectly, part of such income or proceeds thereof in their acquiring an interest

in, establishing, and operating each of the following entities: WDS, Inc., DLP, Resnex, RFS, and B-Pak.

290.    Ewert also used and/or invested, directly and/or indirectly, part of such income or proceeds thereof in operating another enterprise, ODDS.

291.    Each of these entities—WDS, Inc., DLP, Resnex, RFS, B-Pak, and ODDS—engaged and engages in interstate commerce, and/or their activities affected and affect interstate commerce, and each operated as an enterprise within the meaning of RICO.

292.    Defendants' actions violated 18 U.S.C. §§ 1962(a) and 1964.

293.    Defendants' actions injured Plaintiffs in the ways described in this Complaint and proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

### C.  Violations of 18 U.S.C. § 1962(b)

294.    Ewert and Maier each acquired control of Plaintiffs through a pattern of racketeering activity as detailed above.

295.    Plaintiffs engage in interstate commerce, and their activities affect interstate commerce; Plaintiffs operated as an enterprise within the meaning of RICO.

296.    Starting as early as 2006, and continuing into 2009 and through 2016, through their pattern of racketeering activity and through their use of Plaintiffs' then-employees Michael Kennedy and Shawn Nguyen, Defendants obtained, exercised, and maintained control over Plaintiffs and Plaintiffs' spend, as detailed above, and prevented Plaintiffs' detection thereof as detailed extensively in this Complaint.

297.    For instance, Defendants exerted significant control and influence over the decision-making of Plaintiffs' Strategic Sourcing Function through the aforementioned pattern of racketeering activity and, in particular, commercial bribery of several employees of Plaintiffs'

Strategic Sourcing Function, causing Plaintiffs to both expand their relationship with WDS, DLP, Resnex, and other Defendant-affiliated entities, and not discover Defendants' fraudulent scheme before 2016, as detailed above.

298. By way of specific example, Ewert and Maier used Michael Kennedy when negotiating the 2012 and 2015 Agreements with Cargill, with Kennedy feeding information to them via email, including private email, to the detriment of Cargill and to the benefit of WDS, with Defendants ultimately securing Cargill's renewal of the WDS-Cargill Agreements for Cargill and CMS in both 2012 and 2015, thereby perpetuating their fraudulent overcharging.

299. Defendants' actions violated 18 U.S.C. §§ 1962(b) and 1964.

300. Defendants' actions injured Plaintiffs in the ways described in this Complaint and proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

### D. Violations of 18 U.S.C. § 1962(c)

301. Starting as early as 2006, and continuing into 2009 and through 2016, Ewert and Maier each conducted and participated, directly and/or indirectly, in the conduct of the Group, described below.

302. The Group comprised Michael Kennedy (of Cargill/CMS and with believed current or future interest in WDS, DLP, and ODDS), Shawn Nguyen (of Cargill/CMS and of Bay), WDS, Inc., the identified employee of Customer X, Jim Maier (of WDS, DLP, ODDS, DVD Services, and other entities), Paul Thompson (of DLP, B-Pak, and other entities), Ramey Millett (of WDS, Resnex, RFS, and other entities), Stephanie Norris (of WDS, DVD Services, and other entities), Kerry Uptergrove (of WDS), Shawn Bush (of WDS), and Kyle Ingenthron (of WDS)—through a pattern of racketeering activity as detailed above.

303.     The Group, operated and managed by Ewert and Maier, engaged in interstate commerce, and their activities affected  interstate commerce as detailed at length in the preceding paragraphs, and it operated as an association-in-fact enterprise within the meaning of RICO.

304.     Defendants' actions violated 18 U.S.C. §§ 1962(c) and 1964.

305.     Defendants' actions injured Plaintiffs in the ways described in this Complaint and proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

### E.  Violations of 18 U.S.C. § 1962(d)

306.     Ewert and Maier conspired with each other and others known and unknown to violate 18 U.S.C. § 1962 as detailed at length above and took acts in furtherance thereof.

307.     Defendants' conduct violated 18 U.S.C. §§ 1962(d) and 1964.

308.     Defendants' actions injured Plaintiffs in the ways described in this Complaint and proximately caused Plaintiffs damages exceeding $75,000, exclusive of interest and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Cargill, Incorporated, and Cargill Meat Solutions Corporation, respectfully request, with respect to all Counts stated above, that the Court enter judgment in their favor and against Defendants WDS, Inc., Jennifer Maier, and Brian Ewert, and award the following relief:

(a)     Damages flowing from the overcharges by the Defendants in connection with the 2012 and 2015 Agreements, including, without limitation, the $35,177,269 calculated to date;

(b)     Damages in the form of restitution or disgorgement by the Defendants, removing from the Defendants the gains or profits the Defendants unjustly and improperly received as a result of the arrangement and scheme described in this Complaint;

(c)     Damages in the form of the value of any consideration provided by the Defendants to any person in connection with the arrangement and scheme described in this Complaint.

(d)     Treble damages and attorney's fees, including under RICO;

(e)     Punitive damages;

(f)     Prejudgment interest;

(g)     Post-judgment interest;

(e)     Plaintiffs' costs and fees incurred in bringing this action; and

(f)     Other such relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.  Fed. R. Civ. P. 38.

Dated:  1st day of December, 2017.

/s/ Jacob D. Bylund
**FAEGRE BAKER DANIELS LLP**
Jacob D. Bylund (admitted *pro hac vice*)
Jacob.Bylund@FaegreBD.com
Dasha Ternavska (admitted *pro hac vice*)
Dasha.Ternavska@FaegreBD.com

801 Grand Avenue, 33rd Floor
Des Moines, IA, 50309-8011
Telephone: 515-248-9000
Facsimile: 515-248-9010

Christine R. M. Kain (admitted *pro hac vice*)
Christine.Kain@FaegreBD.com

2200 Wells Fargo Center, 90 S. Seventh Street
Minneapolis, MN, 55402

Telephone: 612 -766-8743
Facsimile: 612-766-1600

- AND –

**/s/ Edward F. Hennssey IV**
**Edward F. Hennessey IV**
**Robinson, Bradshaw & Hinson, P.A.**
Edward F. Hennessey IV
N.C. Bar No. 15899
thennessey@robinsonbradshaw.com

Fitz E. Barringer
N.C. Bar No. 42679
fbarringer@robinsonbradshaw.com

101 North Tryon Street, Suite 1900
Charlotte, NC 28246
Telephone: 704-377-2536
Facsimile: 704-378-4000

*Attorneys for Cargill, Incorporated, and Cargill*
*Meat Solutions Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to the following:

Jeffrey S. Southerland
Denis E. Jacobson
Richard W. Andrews
Tuggle Duggins P.A.
P.O. Box 2888
Greensboro, NC 27402
jsoutherland@tuggleduggins.com
djacobson@tuggleduggins.com
randrews@tuggleduggins.com
*Attorneys for Defendants WDS, Inc. and Brian Ewert*

David B. Freedman
Crumpler Freedman Parker & Witt
860 West Fifth Street
Winston-Salem, NC 27101
david@cfpwlaw.com
*Attorneys for Defendant Brian Ewert*

Andrew A. Freeman
Alan M. Ruley
Bell, Davis & Pitt, P.A.
P.O. Box 21029
Winston-Salem, NC 27120-1029
afreeman@belldavispitt.com
aruley@belldavispitt.com
*Attorneys for Defendant Jennifer Maier*

Dated: December 1, 2017.                                    */s/ Edward F. Hennssey IV*
                                                                        Edward F. Hennessey IV