UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:16-cv-00848-FDW-DSC

| | | |
|---|---|---|
| CARGILL, INC., and CARGILL MEAT SOLUTIONS, CORP., | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| WDS, INC., JENNIFER MAIER, and BRIAN EWERT, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THIS MATTER is before the Court upon the filing of several post-trial motions by Plaintiffs and Defendants and one pending pre-trial motion filed by Plaintiffs. Before trial, Plaintiffs sought default judgment against all Defendants as sanction for abusive litigation practices. (Doc. No. 187). After trial, Plaintiffs filed a Motion for Award of Prejudgment Interest (Doc. No. 320), a Motion for Award of Attorneys' Fees and Costs (Doc. No. 325), and a Memorandum of Law on the Unfair and Deceptive Trade Practice Act (Doc. No. 329).[1] Defendants WDS, Inc. ("WDS") and Brian Ewert ("Ewert") move under Rule 50(b) and Rule 59 of the Federal Rules of Civil Procedure for judgment as a matter of law in its favor or in the alternative a new trial. (Doc. No. 322). Defendant Jennifer Maier ("Maier") also filed a motion seeking judgment as a matter of law in her favor under Rule 50(b) or in the alternative, a new trial

---

[1] Defendant Jennifer Maier filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code, but the automatic stay has been terminated and modified to allow this case to "proceed in all respects to completion." (See Doc. No. 346-1). Therefore, the Court can proceed on all motions and matters against all Defendants. (See Doc. Nos. 346, 348).

or amendment to the judgment under Rule 59. (Doc. No. 323). All motions and matters are now ripe for resolution. The Court addresses each motion but not necessarily in the order filed.

# I. BACKGROUND

In the interests of judicial economy, the Court provides a general overview of the case here but summarizes the specific background relevant to the issues raised by the parties' motions in the analysis. Plaintiff Cargill, Inc. ("Cargill") and its wholly owned subsidiary, Cargill Meat Solutions, Corp. ("CMS"), had contractual relations with Defendant WDS. Under these contractual arrangements, Cargill, CMS, and other entities controlled by Cargill ("Cargill Affiliates") purchased products and related services from WDS, as a supplier that provides warehousing and distribution services. WDS was founded and managed by Defendant Maier, as majority owner (51%) and President, and Defendant Ewert, minority owner (49%) and at times, Vice President of Sales. As alleged, this litigation stems from WDS charging prices in the purchase orders generated throughout the course of the parties' relationship that exceeded the margins provided for in the Select Supplier Agreements ("SSAs") executed by Cargill and WDS in 2009, 2012, and 2015 and the actions taken by WDS, Ewert, and Maier to misrepresent and conceal the margins. After a seven day trial, the jury found all Defendants liable for conversion, fraud, and conspiracy to defraud Plaintiffs or engage in commercial bribery that damaged Plaintiffs. The jury found Defendant Ewert liable under the Racketeer Influenced and Corrupt Organizations Act ("RICO") § 1962(a) and (c) and both Defendants Ewert and Maier liable under RICO § 1962(d). The jury found Defendant WDS liable for breach of contract. The jury also found all Defendants misrepresented to Plaintiffs the margins charged on the products WDS supplied to Plaintiffs; falsified business records, including invoices and alleged agreements, in order to further their

misrepresentation to Plaintiffs; and engaged in commercial bribery.  Defendant Ewert also was found by the jury to have engaged in other misrepresentations causing Plaintiffs to continue the business relationship with WDS.  The jury concluded the conduct it found was in or affecting commerce and the proximate cause of Plaintiffs' injury as required by the Unfair and Deceptive Trade Practices Act.  On each of the aforementioned claims, the jury concluded Plaintiffs were entitled to recover $35,177,269.

## II. ANALYSIS

### A. Defendants' Motions under Rule 50(b) and Rule 59

Defendants WDS and Ewert renew their motion under Rule 50 of the Federal Rules of Civil Procedure and move for judgment as a matter of law on several claims and in the alternative move for a new trial under Rule 59(a).  Defendant Maier also moves under Rule 50 for judgment as a matter of law and alternatively moves for a new trial under Rule 59.  Accordingly, the Court considers each of these matters under Rule 50(b) and Rule 59(a), where applicable.

#### 1. Legal Standard

##### a. Federal Rule of Civil Procedure 50(b)

A motion under Rule 50(b) "assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim."  Belk, Inc. v. Meyer Corp., 679 F.3d 146, 155 (4th Cir. 2012).  The moving party must have moved under Rule 50(a) for relief on similar grounds to move after trial under Rule 50(b).  See Fed. R. Civ. P. 50; Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008).  Failure to move under Rule 50(a) and appraise the court of the alleged insufficiency of the suit results in waiver of that unraised insufficiency.  See Varghese v. Honeywell Int'l, Inc., 424 F.3d 411, 423 (4th Cir. 2005); Price v.

City of Charlotte, N.C., 93 F.3d 1241, 1248–49 (4th Cir. 1996); Bridgetree, Inc. v. Red F. Marketing LLC, No. 3:10-cv-00228-FDW-DSC, 2013 WL 443698, at *17 (W.D.N.C. Feb. 5, 2013).

When considering a Rule 50 motion, the court cannot reweigh the evidence or consider the credibility of the witness and must view "all the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in [the prevailing party's] favor." Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999). A jury's verdict will withstand a motion under Rule 50 unless the court "determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 656-57 (4th Cir. 1996) (quoting Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993)); see also Konkel, 165 F.3d at 279. When ruling on a motion under Rule 50(b), the court may allow judgment on the verdict, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

**b. Federal Rule of Civil Procedure 59(a)**

"The grant or denial of a motion for new trial is entrusted to the sound discretion of the district court and will be reversed on appeal only upon a showing of abuse of discretion." Cline v. Wal-Mart Stores, 144 F.3d 294, 305 (4th Cir. 1998) (citing Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 435 (1996)). A court may grant a new trial on some or all of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Acceptable reasons include: "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a

verdict." Cline, 144 F.3d at 301 (quoting Atlas Food Sys. & Servs., Inc. v. Crain Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)). When making this determination, the court may weigh the evidence and consider the credibility of witnesses. Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir. 1985) (citing Wyatt v. Interstate & Ocean Transport Co., 623 F.2d 888, 891-92 (4th Cir. 1980)).

### 2. Select Supplier Agreements

#### a. Enforceability

Defendants WDS and Ewert maintain that the SSAs are not enforceable contracts. (Doc. No. 322-1 at 8). They contend the SSAs are contracts for the sale of goods between merchants, and the SSAs do not contain a quantity term as required under the Uniform Commercial Code. (Doc. No. 322-1 at 8). Although the Uniform Commercial Code section 2-201(1), as adopted by New York, provides that a writing for "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense" unless a quantity term is included, N.Y. U.C.C. § 2-201(1) (McKinney), the SSAs are not contracts for the sale of goods. Goods are "all things . . . which are movable at the time of identification to the contract for sale . . ." N.Y. U.C.C. § 2-105(1) (McKinney). Meanwhile, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price[.]" N.Y. U.C.C. § 2-106(1) (McKinney). In the SSAs, Cargill designates WDS as a "Select Supplier" and Cargill and WDS make mutual promises and covenants to govern their relationship. The SSAs contemplate a relationship between Cargill, Cargill Affiliates, and WDS involving the sale of goods to be facilitated by the issuance of purchase orders, but the SSAs contain no promise to pass title for anything. Accordingly, the Uniform Commercial Code does

5

not govern the enforceability of the contract, and the lack of a quantity term does not render the SSAs unenforceable.

Citing the Alabama Supreme Court decision in <u>Mobil Oil Corp. v. Schlumberger</u>, 598 So. 2d. 1341 (Ala. 1992), Defendants WDS and Ewert also argue that the SSAs standing alone are not enforceable. (Doc. No. 322-1 at 8). However, <u>Mobil</u>[2] does not hold that master agreements are never enforceable contracts. The Supreme Court of Alabama in <u>Mobile</u> stated:

> A master service agreement is not binding alone. A master service agreement provides the framework for subsequent contracts that result from oral or written work orders. . . . "Such a contract 'merely sets out the rules of the game in the event the parties decide to play ball.'"

<u>Id</u>. at 1345 (internal citations omitted). Thus, the Court in <u>Mobil</u> considers master agreements unenforceable until subsequent contracts are made. Although breaching a master agreement only providing the framework for subsequent contracts and the rules for those subsequent contracts may not be possible until a subsequent contract is entered, the Court need not consider that here, because it is undisputed that subsequent contracts were entered. <u>See generally</u> <u>Crown Battery Mfg. Co. v. Club Car, Inc.</u>, No. 3:12CV2158, 2014 WL 587142, at *5 (N.D. Ohio Feb. 14, 2014) (finding enforceable a master supply agreement that "establish[ed] the terms for future purchase orders of batteries"). As supported by the SSAs' and Purchase Orders' language and evidence of Plaintiffs and WDS's expectations and course of performance, the SSAs set forth the "framework for subsequent contracts" and the rules, through promises and covenants, which would govern those subsequent contracts. The Purchase Orders are the subsequent contracts for the actual sale of

---

[2] This case does not involve the application of Alabama law. Therefore, this Court is not bound by any holding in <u>Mobil</u>.

goods. Therefore, the Court cannot conclude that the SSAs are not enforceable contracts as a matter of law.

### b. Superseding Contract

Defendants WDS, Ewert, and Maier submit that they are entitled to judgment as a matter of law on all claims by CMS because the Purchase Orders are unambiguous and supersede any pre-existing agreements, including the SSAs. (Doc. No. 322-1 at 4-6; Doc. No. 323-1 at 18-21). "[W]here the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." Northville Indus. Corp. v. Fort Neck Oil Terminals Corp., 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 1984) (citations omitted). If intent "is determinable by [the] written agreements, the question is one of law[.]" Mallad Constr. Corp. v. County Fed. Sav. & Loan Assn., 298 N.E.2d 96, 100 (N.Y. 1973) (citations omitted). However, if the intent "must be determined by disputed evidence or inferences outside the written words of the instrument[,]" it is a "question of fact[.]" Id. (citations omitted). In this case, the Purchase Orders are not clear and unequivocal. There is no express statement that the Purchase Orders supersede the SSAs. Rather, the Purchase Orders contain language that its terms and conditions shall exclusively govern and any terms WDS includes in their standard sale acknowledgment or other form which alter or are inconsistent with CMS's terms and conditions are of no legal force or effect. The terms and conditions referenced then indicate that they supersede prior agreements between WDS and CMS with respect to the subject matter of the Order. From the contract language and the referenced terms and conditions, the Court cannot conclude as a matter of law that the parties expressed and intended the Purchase Orders to

supersede the SSAs.  As a result, the Court properly submitted the matter to the jury to determine the parties' intent based on the disputed evidence and to construe the ambiguous provisions.  In addition to the language in the SSAs and the Purchase Orders, testimony concerning the parties' dealings leading up the execution of the contracts, the purpose and object of the contracts and their provisions, and their course of performance during the parties' contractual relationship, including Ewert's direction to charge prices in accordance with the SSA after confrontation by Plaintiffs and Maier's falsification of the invoices to make the margins match the SSA, provided substantial evidence for the jury's conclusion that the Purchase Orders did not supersede the SSAs.[3]

### c. Construction

#### i. Affiliate Participation

Defendants WDS, Ewert, and Maier claim that CMS's purchases are not governed by the SSAs because CMS did not opt into the SSAs.  (Doc. No. 322-1 at 9; Doc. No. 323-1 at 13-15).  In other words, Plaintiffs failed to put forth evidence that CMS met the condition precedents for affiliate participation in the SSAs.  The SSAs provided that entities controlled by Cargill, Cargill Affiliates, who met WDS's customer credit requirements, could participate in and receive the benefits of the SSA by among other things issuing a purchase order in accordance with the SSA. The contract language does not provide how such terms are applied. Therefore, this ambiguity warranted resolution by the jury.  As presented at trial, CMS issued Purchase Orders to WDS, and

---

[3] See, e.g., Cromwell Towers Redevelopment Co. v. City of Yonkers, 359 N.E.2d 333, 337 (N.Y. 1976) ("In construing the contract . . ., due consideration must be given to the purpose of the parties in making the contract[.]"); Roberts v. Consolidated Rail Corp., 893 F.2d 21, 24 (2d Cir. 1989) ("[C]ourts look to the acts and circumstances surrounding execution of the ambiguous term to ascertain the parties' intent."); Sea Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc., 728 F. Supp. 2d 531, 535 (S.D.N.Y. 2010) ("[W]hen considering a sale of goods contract under the U.C.C., the determination of a contract's meaning is not made in a vacuum. Rather, it is done *in conjunction with* evidence about course of dealing, usage of trade, and the parties' course of performance so long as that extrinsic evidence does not contradict the contract's language.").

WDS accepted and fulfilled them. Evidence of the parties' purpose for entering the SSAs, including the notice to suppliers regarding select supplier agreements that accompanied the SSAs, and evidence of other acts, like representing that WDS was not charging more than ten percent and correcting margins in CMS purchases to conform to the SSAs' margins upon confrontation, also support the jury's finding in favor of CMS. Substantial evidence buttresses a conclusion that CMS was a party to the SSAs in accordance with the SSAs provisions.

### ii. Referencing the SSAs

Defendant Maier asserts Plaintiffs are barred from recovery because Plaintiffs did not reference the SSAs in the Purchase Orders. (Doc. No. 323-1 at 18). However, this argument is waived; Maier did not move for judgment as a matter of law under Rule 50(a) on this or related grounds. It also plainly fails. The plain language cited by Maier does not create a duty, material or otherwise, requiring Plaintiffs to reference the SSAs in the Purchase Orders. (See Doc. No. 323-1 at 18). The clause following the language cited by Maier, which is omitted from her brief, expressly states that the SSAs will govern even if the SSAs are not referenced in the Purchase Orders. (See Doc. No. 347 at 13-14).

### iii. Losses for Cargill's Negligent Act or Omission

Maier also construes the SSAs to bar recovery in this action because the losses arose out of Plaintiffs' negligence. (Doc. No. 347 at 21-22). In addition to being a waived argument, this interpretation ignores the plain language of the provision, the defined terms, and the context of the provision. Section 12 of the SSAs provide that except as limited in Section 13, WDS agrees to indemnify and hold harmless Cargill from all "Losses" as defined therein. Section 13 reflects that WDS will not be liable for Losses arising out of Cargill's negligent act or omission. From the

language of these provisions and considering the contract as whole, the Court cannot conclude as a matter of law that the parties intended to contractually prohibit the liability of third parties, like Maier, for her torts against Plaintiffs. Even if unambiguously expressed, a contractual provision prohibiting liability for intentional torts, as advanced by Maier, would be unenforceable as contrary to public policy. <u>Kalisch-Jarcho, Inc. v. City of New York</u>, 448 N.E.2d 413, 416-17 (N.Y. 1983).

### iv. All Products

Defendant Maier also argues the SSAs do not cover the sale of all products by WDS. (Doc. No. 323-1 at 16-18). As Maier did not move under Rule 50(a) for judgment in her favor on these grounds, this contention is waived. Nevertheless, the language in the SSAs and the trial record support the jury's determination in favor of Plaintiffs. The SSAs, relevant to the claims, from 2012 and 2015 provide that the Supplier will apply a fixed margin to determine pricing on all products in accordance with a schedule that set margins for specific named suppliers, all other identified trilateral spend, and all other identified non-trilateral spend. As the language is ambiguous, the Court properly delegated to the jury the responsibility of construction. Plaintiffs put forth testimony and evidence from those involved in the negotiation and oversight over the SSAs, testimony and evidence of the purpose of the SSAs, and the parties' actions while operating under the contract supporting a construction in favor of Plaintiffs. Hence, from this evidence and the explicit contractual language of all products, a reasonable jury could find in favor of Plaintiffs.

### d. Conclusion

For all the foregoing reasons, the Court concludes Defendants are not entitled to judgment as a matter of law in their favor and finds no grounds justifying a new trial.

### 3. Economic Loss Rule

Defendants WDS, Ewert, and Maier[4] aver the Court erred by submitting Plaintiffs' tort claims to the jury when all these claims are premised on WDS's alleged overcharging for products covered by the SSAs.  (Doc. No. 322-1 at 10; Doc. No. 323-1 at 3-4).  "Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor."  N.C. State Ports Authority v. Lloyd A. Fry Roofing, Co., 240 S.E.2d 345, 350 (N.C. 1978) (citations omitted).  However, there are situations when a promisor will be liable for a tort, such as when "[t]he injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor."  Ports Authority, 240 S.E.2d at 350-51; see also Beaufort Builders, Inc. v. White Plains Church Ministries, Inc., 783 S.E.2d 35, 40 (N.C. Ct. App. 2016).  Hence, North Carolina appellate courts have limited the application of this bar, commonly known as the economic loss rule, to the barring of negligence claims.  Bradley Woodcraft, Inc. v. Bodden, 795 S.E.2d 253, 258 (N.C. Ct. App. 2016).  Appellate courts have held that claims of fraud are not barred by this rule.  Bradley Woodcraft, 795 S.E.2d at 259 (citing Jones v. Harrelson & Smith Contr'rs, LLC, 670 S.E.2d 242, 250 (N.C. Ct. App. 2008)).  Thus, following the "the final authority on state law" for the tort claims brought in this diversity suit, Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177-78 (1940), the Court concludes and reaffirms its determination that Plaintiffs' tort claims are not barred by the economic loss rule.  All of Plaintiffs' tort claims fall into the category recognized as actionable torts in Ports Authority despite a related existing contract.  Plaintiffs presented circumstantial and direct evidence of Defendants' conduct, through testimony and exhibits, showing or tending to show intentional false representations and payments of goods

_____

[4] Defendant Maier for the first time argues that New York's economic loss doctrine applies.  (Doc. No. 323-1 at 3). This argument has been waived by failing to preserve it in her Fed. R. Civ. P. 50(a) motion.  Maier did not raise it in her Rule 50(a) motion or by joining in WDS and Ewert's Rule 50(a) motion.  Liberally considering the record, the Court has assumed for purposes of this Order that Maier joined in WDS and Ewert's Rule 50(a) motion.

and services to pivotal Cargill employees and others in exchange for favorable treatment, including concealment of fraud and breach. On this evidence and other evidence presented at trial, the Court did not err in submitting instructions to the jury on torts.[5]

### 4. Fraud

Defendants WDS and Ewert argue that there was insufficient evidence to support a fraud claim against them.[6] (Doc. No. 322-1 at 11). They appear to argue that Plaintiffs' knowledge of the margins provided for in the SSAs and the costs provided for in its contracts with trilateral product suppliers preclude reasonable reliance. (Doc. No. 322-1 at 11). Meanwhile, Defendant Maier[7] argues that the only evidence supporting her fraud claim is her admitted misrepresentation of invoices sent to Plaintiffs in March 2016, which she contends was not relied on by Plaintiffs. (Doc. No. 323-1 at 7).

Defendants' narrow view of a claim for fraud and the evidence presented supporting a claim for fraud is not supported by the law or by the evidence. "Fraud has no all-embracing definition . . . [b]ecause of the multifarious means by which human ingenuity is able to devise means to gain advantages by false suggestions and concealment of the truth[.]" <u>Vail v. Vail</u>, 63 S.E.2d 202, 205 (N.C. 1951). However, the elements of fraud are generally recognized as "(1)

---

[5] Defendants WDS and Ewert argue that the damages awarded by the jury were excessive because Plaintiffs were not required to prove, and did not produce evidence of, any damages other than the overcharges. (Doc. No. 322-1 at 14). However, as explained above, the economic loss rule does not bar Plaintiffs' tort claims, and Defendants have cited no case law to support their proposition.

[6] Defendants WDS and Ewert did not preserve this arguments, except to the extent they argue there was a lack of reasonable reliance. Therefore, WDS and Ewert's broad objection is waived.

[7] The jury found Plaintiffs' claims for fraud were not barred by the statute of limitation. (Doc. No. 314). Consistent with the North Carolina patterned instructions, the jury was asked "Did the Plaintiffs file this action within three years after discovery of the facts constituting the fraud?" and was instructed as to discovery and reasonable diligence to discover. (Doc. No. 314). Defendant Maier mistakenly overlooks that the cause of action accrues and the statute of limitations begins running upon discovery by Plaintiffs—not the occurrence of the facts constituting the fraud, N.C. Gen. Stat. § 1-52(9); <u>Vail v. Vail</u>, 63 S.E.2d 202, 207 (N.C. 1951). (Doc. No. 351 at 4). Therefore, despite Defendant Maier's attempt, whether Maier committed a continuing wrong is moot. (Docs. No. 323-1 at 7; Doc. No. 347 at 9). The jury concluded Plaintiffs' claim of fraud resulting in damages of $35,177,269 was timely.

[f]alse representation or concealment of a [past or existing] material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." <u>Hardin v. KCS Int'l, Inc.</u>, 682 S.E.2d 726, 733 (N.C. Ct. App. 2009) (citations omitted). Thus, "fraud may be based on an 'affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose.'" <u>Id</u>. (quoting <u>Harton v. Harton</u>, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986)). A duty to disclose arises when "a party has taken affirmative steps to conceal material facts from the other[.]" <u>Id</u>. (quoting <u>Sidden v. Mailman</u>, 529 S.E.2d 266, 270-71 (N.C. Ct. App. 2000)).

Here, Plaintiffs presented evidence showing the origination of the price figures used in the purchase orders, including testimony that Ewert and Maier gave to Kerry Uptergrove, the product manager for WDS, the prices, which were then provided to employees of Plaintiffs. The resulting purchase orders charged margins on goods exceeding the margins set in the SSAs. Neither WDS, Ewert, nor Maier informed either Plaintiff of the actual margins charged to Plaintiffs and, at times, misrepresented the margin. Kevin Walker, Plaintiff's expert, testified that the sum of net overcharges during the terms of the 2012 and 2015 SSA equal $35,177,269. Ewert directed others to fabricate documents with false information that he or others then provided to employee of Plaintiffs as legitimate. Ewert instructed WDS employees to withhold or misrepresent information about pricing, capabilities of WDS's software, and WDS's relationship to other vendors. Neither WDS, Ewert, nor Maier disclosed their financial interests in other vendors that supplied goods to WDS that were then sold to CMS. Ewert decided to keep all savings from its suppliers lowering prices instead of passing the savings on to CMS. Maier's responsibilities and role, as president of WDS, included overseeing day-to-day management of WDS and participating in the negotiations

and executions of contracts. In this capacity and as majority shareholder, she executed the 2008 agreement, which allocated 70.6% of WDS profits to Ewert's wholly owned corporation, ODDS, LLC ("ODDS") for Ewert's cultivation of business relationships and marketing services. The supervisor of sales, head of human resources, purchasing manager, chief operations officer, and corporate accountant, which included Brian Ewert, all reported to Maier. In addition to the 2016 invoices that Maier admits she falsified, Maier misrepresented an agreement in 2011, rebates owed to SSA, other information provided to Plaintiffs employees that omit certain vendors, and Ewert's departure from WDS.

Further, evidence tending to show Ewert and Maier took affirmative steps to conceal material facts was put forth. WDS and ODDS, with the authorization of WDS's corporate accountants, paid for trips and gifts for members of Cargill's strategic sourcing division, who were responsible for executing and overseeing the SSAs with WDS, and for a procurement manager. These expenditures included yacht trips costing over $100,000. WDS, with the consent of Maier and Ewert, also paid for the health insurance under WDS's employee plan for the mother-in-law of Chuong Shawn Nguyen, a member of Cargill's strategic sourcing division. WDS, Maier, and Ewert arranged payment of these bribes through WDS's payment of commissions to ODDS under the 2008 agreement. Additionally, at Ewert's direction, WDS's corporate accountants transferred money from WDS to ODDs to Ewert's personal Money Market Account. Ewert, then, withdrew thousands of dollars of cash. Subsequently, Ewert mailed packages with the FedEx costs, at times invoiced to Maier's American Express, or Ewert traveled to the place of residence of the members of Cargill's strategic sourcing division. The emails and text messages between Ewert and members of Cargill's strategic sourcing division, the procurement manager, and other influential employees

of Cargill's customers show a *quid pro quo* relationship.  Further, the timing of the trips, gifts, or cash withdraws often coincide with the consideration of rebates or contracts, to which WDS, Ewert, and Maier had interests in seeing executed in their favor.  WDS, Ewert, and Maier did not inform CMS or Cargill of these trips, gifts, or cash payments.  The SSAs required WDS to adhere to a Supplier Code of Conduct, which included an obligation to compete fairly for Cargill's business, without any illegal or improper inducements or advantages.  Additionally, Cargill had adopted an anti-bribery policy for its employees and employees of all subsidiaries and affiliates. Maier and Ewert also threatened its non-trilateral suppliers' employees like Brian Kincannon to honor their confidentiality obligations or face legal action in order to keep actual invoices out of the Plaintiffs' hands.  Without the actual invoices, Plaintiffs could not determine the actual margins being charged in the purchase orders.  Ewert also suppressed WDS's own employees like Kerry Uptergrove from raising any concerns by telling them to focus on their job.

Testimony and evidence on Plaintiffs' inability to reasonably discern the actual costs for products sold by WDS without their cooperation was also shown.  Plaintiffs' agreements with suppliers within the trilateral category set pricing formulas, not discrete prices.  These formulas resulted in daily price variation preventing Plaintiffs from reasonably knowing the costs charged to WDS and thus inhibiting Plaintiffs from calculating WDS's margins on those products. Plaintiffs were not privy to WDS's contracts with non-trilateral suppliers or their invoices. Defendants employed confidentiality requirements with its suppliers.  Even after the initiating of the audit of WDS, Defendants tactically continued to make misrepresentations to stop, delay, and

hinder the audit. After receiving Maier's fabricated invoices in 2016, Plaintiffs continued to purchase products from WDS.[8]

From such evidence, a reasonable jury could conclude that WDS, Ewert, and Maier[9] committed fraud through either or both a false representation or a concealment of a material fact that resulted in injury to Plaintiffs of $35,177,269. Therefore, Defendants are not entitled to judgment as a matter of law in their favor on the fraud claim.[10]

**5. Conversion**

Defendants WDS and Ewert contend Plaintiffs' did not present evidence that Plaintiffs retained ownership in the funds sent to WDS, entitling them to judgment on the conversion claim. (Doc. No. 322-1 at 15-16). "Conversion is 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" Wall v. Colvard, Inc., 149 S.E.2d 559, 564 (N.C. 1966) (citations omitted). "[T]he fact the parties had a contract does not prevent plaintiffs' claim for conversion." Se. Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 207 (N.C. Ct. App. 2002). "A party who comes into possession of . . . converted funds [pursuant to a contract or otherwise] 'will

---

[8] During trial, Plaintiffs' expert testified that the net overcharges occurring from February 1, 2012 through April 30, 2016 equaled $35,177,269. Plaintiffs sought this amount in damages for all claims.

[9] Defendant Maier, in a footnote, additionally moves for a reduction of damages from $35,177,259 to $191,076 under Fed. R. Civ. P. 59(e), asserting again that the only conduct within the applicable statute of limitations that can form the basis of a claim against her occurred in 2016. (Doc. No. 323-1 at 24 n. 12). A Rule 59(e) motion seeking to "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment" is not proper. Exxon Shipping Co., 554 U.S. at 485 n.5; see also Pac. Ins. Co., 148 F.3d at 403. A court may only grant a motion under Rule 59(e) to alter or amend a judgment if it finds "that there has been an intervening change of controlling law, that new evidence has become available, or that there is a need to correct a clear error or prevent manifest injustice." Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 411 (4th Cir. 2010). Here, Defendant Maier is rearguing old matters and has not explained any reason justifying granting a Rule 59(e) motion. As found by the jury, the statute of limitations also does not limit Plaintiffs' damages against Maier. Maier's motion pursuant to Rule 59(e) is denied.

[10] Defendant Maier makes the same arguments for the claim of unfair and deceptive trade practices. (Doc. No. 323-1 at 7). She also argues there is no evidence she participated in a conspiracy. (Doc. No. 323-1 at 8). These arguments fail for the same reasons they fail for fraud.

16

not be permitted . . . to use [the] funds when he is fully aware of their nature, or there are circumstances to awaken suspicion and put him on inquiry.'" <u>Variety Wholesalers, Inc. v. Salem Logistics Traffic Services, LLC</u>, 723 S.E.2d 749 (N.C. 2012) (quoting <u>Lavecchia v. N.C. Joint Stock Land Bank of Durham</u>, 1 S.E.2d 119, 120 (N.C. 1939)).   As addressed in <u>Variety Wholesalers</u>, whether the plaintiff retains ownership over funds, as required for a conversion claim, may require establishing ownership of the funds after the plaintiff voluntarily transferred the funds to another. <u>Id</u>. at 747.  In that case, whether the plaintiff retained ownership turned on the construction of ambiguous contract language. <u>Id</u>.  Here, as well, Plaintiffs' "ownership" and "retained ownership" turned on the jury's construction of the SSAs and the Purchase Orders.  The evidence previously discussed supporting the interpretation of the SSAs and the Purchase Orders and the claim for fraud, along with evidence of Plaintiffs' payments through an automatic clearing house ("ACH") to WDS; Ewert and Maier's ownership of WDS; Ewert and Maier's admitted control and their admitted withdrawal from WDS's accounts, to which Plaintiffs made their payments; and subsequent distributions from WDS to Ewert and Maier provide substantial evidence supporting the jury's verdict for conversion against each Defendant: Plaintiffs "retained ownership" over the $35,177,269 assumed by Defendants in excess of the costs and margins established in the SSAs.

Relying on <u>Variety Wholesalers</u>, Defendant Maier advances that the conversion claim fails because Plaintiffs did not present evidence showing the specific source or specific destination of the converted funds.  (Doc. No. 323-1 at 6 (citing <u>Variety Wholesalers</u>, 723 S.E.2d at 751)).  As Maier declined to raise this issue in a Rule 50(a) motion, this argument is waived.  Maier also did not propose instructions or object to the final jury instructions on these grounds.  Further, on this

record, it cannot prevail: substantial evidence, as summarized in the previous paragraph, supports Plaintiffs' conversion claim against each Defendant, including Maier.

Accordingly, the Court denies all Defendants request for judgment as a matter of law and finds no basis for a new trial.

### 6. Unfair and Deceptive Trade Practices

Defendants contend the Court erred by instructing the jury on North Carolina's Unfair and Deceptive Trade Practices Act, because North Carolina law cannot apply to Plaintiffs' claim. (Doc. No. 322-1 at 15; see Doc. No. 323-1 at 7 n.2). Federal courts must apply the conflict of law rules of the state in which they sit when sitting in diversity jurisdiction. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (4th Cir. 1941). North Carolina courts follow the traditional conflict of laws rule for matters affecting substantial rights of the parties—lex loci, the law of the situs of the claim. Boudreau v. Baughman, 368 S.E.2d 849, 853-54 (N.C. 1988). For actions sounding in tort, including unfair or deceptive trade practices claims, "the state where the injury occurred is considered the situs of the claim." Boudreau, 368 S.E.2d at 854; United Va. Bank v. Air-Lift Assocs., 339 S.E.2d 90, 94 (N.C. Ct. App. 1986). North Carolina courts have rejected a bright line rule that the injured party, such as the Plaintiffs in this case, suffers its injury at its principal place of business. Harco Nat'l Ins. Co. v. Grant Thornton, 698 S.E.2d 719, 725-26 (N.C. Ct. App. 2010). Instead, courts analyze and determine where an injured party in fact sustained its alleged injury to determine the applicable law. Id. at 726. Defendants WDS and Ewert argue that no evidence was presented that Plaintiffs suffered any harm in North Carolina. However, Plaintiffs presented evidence that payment through ACH of the Purchase Orders containing overcharges was

paid to WDS at a North Carolina address.[11] The parties also stipulated and read into evidence that WDS is a corporation existing under the laws of the State of North Carolina. Therefore, the Court properly found that Plaintiffs' injury occurred when Plaintiffs paid WDS in North Carolina. As the last act giving rise to Plaintiffs' claim for unfair and deceptive trade practices occurred in North Carolina, the Court did not err by instructing the jury on North Carolina's Unfair and Deceptive Trade Practice Act.

### 7. Conspiracy

Defendant Maier for the first time argues that the conspiracy claim and the RICO conspiracy claim are barred by the intra-corporate conspiracy doctrine.[12] (Doc. No. 323-1 at 8). This argument has been waived by failing to preserve the argument, and Defendant Maier cites no authority that would allow her to make this argument for the first time at this stage in the proceedings. Further, as argued by Plaintiffs, Maier's argument is also moot. (Doc. No. 347 at 12). The doctrine, established in the field of antitrust law in Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir.1952), held that "a corporation cannot conspire with its agents because the acts of the agents are acts of the corporation itself." Bank Realty Inc. v. Practical Mgmt. Tech. Inc., No. 90-2128, 1991 WL 97490, at *4 (4th Cir. June 11, 1991)

---

[11] Defendants WDS and Ewert also admitted that certain payments of the Purchase Orders were made to a bank account located in North Carolina. (Doc. No. 182 at ¶ 238).

[12] Although the Fourth Circuit has recognized the applicability of the intra-corporate conspiracy doctrine in the antitrust context, Greenville Publishing Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974), and section 1985 civil rights context, Buschi v. Kirven, 775 F.2d 1240, 1252-53 (4th Cir.1985), these claims are not before the Court in this case. The one case cited by Maier that addresses and applies the intra-corporate conspiracy doctrine in the context of RICO is not binding on this Court, Walters v. McMahen, 795 F. Supp. 2d 350, 358-59 (D. Md. 2011), and on appeal to the Fourth Circuit, the court expressly stated "[b]ecause we conclude that the plaintiffs have failed to plead adequately a cause of action under 18 U.S.C. § 1962(d), we need not address the separate issue whether the intracorporate immunity doctrine bars their cause of action[,]" Walters v. McMahen, 684 F.3d 435, 445 n.11 (4th Cir. 2012). The Fourth Circuit case, Detrick v. Panalpina, Inc., 108 F.3d 529, 544 (4th Cir. 1997), cited by Maier also involves counterclaims for conspiracy under Virginia law, not North Carolina law.

(unpublished table decision). Here, the jury found for Maier on all claims that named WDS as an enterprise. Also, the jury instructions required for conspiracy a finding that WDS, Maier, and Ewert agreed with each other and others known and known. Similarly, for a finding of RICO 1962(d) conspiracy, the jury instructions required a finding that two or more people agreed. Thus, even if the intra-corporate doctrine applies as claimed by Defendant Maier, it is moot.

### 8. Racketeer Influenced and Corrupt Organizations Act

Defendants WDS and Ewert maintain that the Court erred by allowing evidence and argument on Plaintiffs' RICO claims. (Doc. No. 322-1 at 12). Citing no binding precedent, Defendants WDS and Ewert contend this case "involves nothing more than two merchants disputing the pricing terms of their written agreements for the sale of goods[,]" rendering "Plaintiffs' RICO claim[s] . . . inappropriate and its inclusion . . . inconsistent with the statutory design of RICO." (Doc. No. 322-1 at 13). Defendants' contention, however, does not accurately reflect the trial record. Plaintiffs presented evidence of the overcharges in the Purchase Orders; allocation of a majority of WDS's profits, resulting from the overcharges, to ODDS, Ewert, and Maier; withdraws of tens of thousands of dollars in cash from ODDS prior to Ewert travelling across state lines to interact with influential members of Cargill's strategic sourcing division or mailing a package across state lines; hundred-thousand dollar plus yacht trips and other trips for influential members of Cargill's strategic sourcing division, often in close proximity to the execution of contracts involving Defendants; other expensive entertainment and benefits for such individuals and others; extensive communication between Ewert and these individuals in other states to further profit from overcharges or conceal the overcharges; and fabrication of contracts and invoices sent across state lines. Courts in similar circumstances have recognized the

availability of RICO claims under subsection 18 U.S.C. § 1962. See, e.g., Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 500 (1985); In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 122-23 (2d Cir. 2013); Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am., 113 F.3d 308, 309-10 (2d Cir. 1997). As Defendants WDS and Ewert's alleged error is without merit, the Court denies their request for judgment as a matter of law and a new trial.

Defendant Maier moves for judgment as a matter of law by asserting that the RICO conspiracy claim under section 1962(d) cannot stand alone. (Doc. No. 323-1 at 9-10). Once again, this argument has been waived by failing to preserve it on the record by moving under Rule 50(a). Further, Plaintiffs' prevailed on RICO claims under sections 1962(a) and 1962(c) against Ewert. Therefore, unlike the cases relied on by Maier,[13] Plaintiffs' RICO conspiracy claim under section 1962(d) against Defendant Maier does not stand alone. See Beck v. Prupis, 529 U.S. 494, 506-07 (2000). ("Under our interpretation, a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962.").

Defendant Maier also claims that the RICO predicate acts are not the but-for and proximate cause of Plaintiffs' damages of $35,177,269, as awarded by the jury. (Doc. No. 323-1 at 10-11). Although this argument has been waived by failing to preserve the issue, the Court disagrees with Defendant Maier's interpretation of the Walter's opinion and attempt to analogize those facts with the facts of this case. Unlike Walter, the Court is not considering the sufficiency of the complaint,

---

[13] Walters, 684 F.3d at 440 (holding failure to plead plausible violation of either predicate act fatal to section 1962(c) claim, which rendered plaintiffs' claims under section 1962(d) for conspiracy to violate section 1962(c) insufficient); Tal v. Hogan, 453 F.3d 1244, 1249-50, 1252, 1270 (10th Cir. 2006) ("Because Appellants have failed to allege a sufficient claim under subsections (b) or (c), their subsection (d) conspiracy claim fails as a matter of law."); Lightning Lube v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1983) (same).

and concerns about causation were not raised and are not present in this case. Walter, 684 F.3d at 444 (citing Holmes, 503 U.S. 258, 269-70 (1992)); see also Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 459-61 (2006) (considering Holmes factors). Further, the jury, as instructed, found proximate cause for an award of $35,177,269. Based on the evidence previously discussed, the Court cannot conclude that no reasonable jury could conclude in Plaintiffs' favor on their claim for RICO conspiracy against Maier and that such violation proximately damaged Plaintiffs in the amount of $35,177,269.

**9. Cargill Meat Solutions**

Maier asserts claims by CMS for conversion and fraud against Maier fail for insufficient evidence of payment by CMS or misrepresentation to CMS or any of its employees. (Doc. No. 323-1 at 6, 11; Doc. No. 351 at 7-8). However, this argument has been waived. Maier did not move for judgment as a matter of law against CMS for lack of evidence as to the elements of a claim for conversion or fraud. Further, for the reasons previously stated, the Court finds sufficient evidence to support Cargill and CMS's claim for conversion and fraud.

**10. Maier's Counterclaims**

Maier contends she is entitled to judgment as a matter of law on all her counterclaims, which seek declaratory judgments, for the reasons she is entitled to judgment as a matter of law on Plaintiffs' claims. (Doc. No. 181; Doc. No. 323-1 at 23). For the reasons stated in this Order denying Maier's motion as to Plaintiff's claims and allowing judgment on the verdict, the Court declines to declare the rights of the litigants as sought by Maier. 28 U.S.C. § 2201(a); Wilton v. Seven Falls Co., 515 U.S. 277, 286-88 (1995).

**11. Jury Instructions**

Defendants WDS, Ewert, and Maier[14] submit that the instructions to the jury and verdict form that reference Cargill and CMS collectively as Plaintiffs prejudiced Defendants, entitling Defendants to a new trial. (Doc. No. 322-1 at 3; Doc. No. 323-1 at 23). Defendants argue the instructions impermissibly treated Cargill and CMS as one entity. (Doc. No. 322-1 at 3).

"District courts are necessarily vested with a great deal of discretion in constructing the specific form and content of jury instructions." Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1293 (4th Cir. 1995) (citing Price v. Glosson Motor Lines, Inc., 509 F.2d 1033, 1036 (4th Cir. 1975)). Specific jury instructions "may not be judged in artificial isolation, but must be viewed in the context of the overall charge[,]" Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011) (quoting Henderson v. Kibbe, 431 U.S. 145, 153 n. 10 (1977)), for "the charge in its totality was what the jury heard[,]" id. at 586. "Instructions will be considered adequate if construed as a whole, and in light of the whole record, they adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the [objecting] party." Gentry v. E. W. Partners Club Mgmt. Co. Inc., 816 F.3d 228, 233 (4th Cir. 2016) (quoting Bunn v. Oldendorff Carriers GmbH & Co. KG, 723 F.3d 454, 468 (4th Cir. 2013)).

Here, the jury instructions, as read to the jury, set out early in the trial that Plaintiffs were two separate entities, Cargill and CMS. Form thence forth, the jury instructions referenced them collectively as Plaintiffs and the verdict form, consistent with the jury instructions, referenced

---

[14] Defendant Maier also alleges that asking the jury "Do you find any of the following Defendants liable to Plaintiffs under the Unfair or Deceptive Trade Practices Act?" was an error because the jury does not determine whether the act was unfair or deceptive. (Doc. No. 323-1 at 24). As reflected in the record, the jury instructions did not ask the jury whether the acts were unfair or deceptive. These terms were not defined. Rather, the jury was asked to address the factual questions of in or affecting commerce and causation, which are necessary elements for an Unfair and Deceptive Trade Practices Act claim, and answer in the affirmative to the question if they so found. Further, Maier never objected to the phrasing of the question. In fact, Defendants agreed in the proposed instructions submitted to the Court to the listing of Plaintiffs' first claim or count as a violation of the Unfair and Deceptive Trade Practices Act and proposed verdict questions that used the terminology "unfair or deceptive act."

them collectively as Plaintiffs. The jury was then instructed on all six claims of Plaintiffs' burden to prove each elements as to Plaintiffs. As argued by Plaintiffs, the reference to Plaintiffs collectively was appropriate on the trial record because Plaintiffs' claims arose from the same set of facts and Plaintiffs' expert testified that Plaintiffs' collectively sustained damages from contractual overcharges of $35,177,629. On this trial record,[15] collective references to Plaintiffs was appropriate and necessary to avoid jury confusion and to avoid the possibility of an excessive or duplicative award of damages. See generally Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc., 975 F. Supp. 681, 691 (D.N.J. 1997), aff'd & remanded, 181 F.3d 446 (3d Cir. 1999) (rejecting defendants' post-trial argument of error for the verdict's failure to separate damages for each wholly owned, vertically aligned subsidiary plaintiff). The jury instructions provided a correct statement of the law applicable to the claims and "left the attorneys ample room to argue their case." Noel, 641 F.3d at 587. The Court does "not bear the burden of highlighting helpful arguments nor of marginalizing harmful ones." Id. The jury instructions properly let counsel argue factually whether Plaintiffs had or had not met their burden and proven the elements required for an answer in their favor on the verdict form. See id. Therefore, the Court concludes it did not err and denies Defendants' request for a new trial.

**12. Excessive Damages**

---

[15] Cargill moved to amend its complaint to add CMS after Defendants Ewert and WDS sought to amend their answer to allege that Cargill was not the real party in interest and did not have standing to sue for any transactions involving Cargill Meat Solutions. (See Doc. No. 37-1; 39-1; 49). Cargill argued joinder proper under Fed. R. Civ. P. 20, which permits the joinder of a party if "they assert any right to relief jointly, severally, . . . and any question of law or fact common to all plaintiffs will arise in the action." The Court agreed and granted the motion to amend and join CMS. (Doc. No. 55). As Plaintiffs seek relief jointly and severally, as permitted under Rule 20, the Court did not err as to the instructions and verdict form. See generally, Fenton v. Freedman, 748 F.2d 1358, 1359-1361 (9th Cir. 1984) (affirming judgment in favor of co-plaintiffs Shaindy Fenton and Shaindy Fenton, Inc. where acts of co-plaintiffs were "so intertwined . . . that the claims could have been filed jointly" and the court joined Shaindy Fenton, Inc. after defendants sought to dismiss the case because "Shaindy Fenton was not the real party in interest since the evidence showed all transactions sued upon were entered into between Shaindy Fenton, Inc. and [defendants]").

Defendants WDS and Ewert argue they are entitled to a new trial because the jury's award of damages was excessive. (Doc. No. 322-1 at 13). <u>See</u> <u>Cline</u>, 144 F.3d at 305; N.C. R. Civ. P. 59(a)(6). Defendants WDS and Ewert argue the damages are excessive for reasons previously raised and overruled by the Court, including the collective reference to Plaintiffs, the allowance of tort claims, the lack of reliance by Plaintiffs on misrepresentations by Defendants, and the lack of reasonable reliance on misrepresentations as to trilateral products. (Doc. No. 322-1 at 14-15). The Court incorporates its previous analysis and rulings on these matters, and accordingly, denies Defendants WDS and Ewert's request for a new trial on the grounds of excessive damages for the North Carolina or federal claims.

### 13. Evidentiary Rulings

Errors in admitting or excluding evidence are not grounds for a new trial "[u]nless justice requires[.]" Fed. R. Civ. P. 61. "A party may claim error in a ruling to admit . . . only if the error affects a substantial right of the party and . . . [the] party, on the record: timely objects or moves to strike; and states the specific grounds, unless it was apparent from the context." Fed. R. Evid. 103(a)(1). An error is harmless and does not require a new trial if the court can "say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors.'" <u>Taylor v. Va. Union Univ.</u>, 193 F.3d 219, 235 (4th Cir. 1999) (citations omitted). By focusing on "whether the error itself had substantial influence[,]" this analysis allows the court to distinguish between harmless errors and those impacting a substantial right. <u>Id</u>.

#### a. Parol Evidence

Defendants WDS and Ewert argue parol evidence was inadmissible as to the terms of the Purchase Orders because the Purchase Orders were clear and unambiguous. (Doc. No. 322-1 at 6). As previously addressed by the Court in subsection I.A.2.b., the Court properly concluded that the contract terms at issue in this case, including those in the Purchase Orders, were ambiguous. The Terms and Conditions language in the Purchase Orders did not have "a definite and precise meaning." Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y. 2009) (citation omitted) (defining the lack of ambiguity). Therefore, the admission of parol or extrinsic evidence was not an error. Innophos, Inc. v. Rhodias, 882 N.E.2d 389, 392 (N.Y. 2008).

**b. Depositions of Charles Milacki and Chuong Shawn Nguyen**

Defendants WDS and Ewert contend the admission of deposition testimony of Chuong Shawn Nguyen ("Nguyen") and Charlie Milacki ("Milacki") asserting the Fifth Amendment against self-incrimination improper pursuant to Federal Rules of Evidence 401, 402, and 403. (Doc. No. 322-1 at 16).[16] First, Defendants reason the admission and allowance of a negative inference against Nguyen and Milacki[17] an error given their status as non-parties. However, Defendants cite no binding authority for this proposition. See generally Fed. R. Evid. 402. The Fifth Amendment of the Constitution states "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This prohibition allows a person to assert his or her Fifth Amendment privilege and refuse to answer "official questions put to him in any

---

[16] Maier also stated, without elaboration or citation, that "the admission of certain testimony as to Maier was also improper and prejudicial, such as the non-parties that invoked the Fifth Amendment . . . ." (Doc. No. 323-1 at 24). From this mere listing of this alleged error, Maier has not shown an acceptable reason for the grant of a new trial. Cline, 144 F.3d at 301. Further, the Court concludes herein the errors alleged by Defendant WDS and Ewert are not errors. Therefore, the Court denies Maier's request for a new trial.

[17] As pointed out by Plaintiffs, the instruction allowing a negative inference was limited to the witnesses themselves, Nguyen and Milacki. (Doc. No. 340 at 24).

other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings[,]" Lefkowitz v. Turley, 414 U.S. 70, 77 (1973), but it does not preclude in a civil case the admissibility of the assertion of the Fifth Amendment privilege or an adverse inference, see Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). The Supreme Court and the Fourth Circuit have not expressly addressed the matter as to non-parties, but other circuits have found admission of testimony and the allowance of negative inferences against non-parties proper in civil actions, see, e.g., LiButti v. United States, 107 F.3d 110, 124 (2d Cir. 1997); FDIC v. Fidelity & Deposit Co. of Md., 45 F.3d 969, 977 (5th Cir. 1995) (finding "no constitutional bar to the admission of [a nonparty's invocation of the Fifth Amendment privilege]").

Second, Defendants argue the testimony is not relevant because they do not testify to any fact and the negative inference is against them, not Defendants. To the contrary, "silence in the face of accusation is a relevant fact[.]" Baxter, 42 U.S. at 319. Invoking the Fifth Amendment privilege when questioned about accepting bribes from Defendants and their actions in furtherance of Defendants' overcharging of Plaintiffs is relevant: "it has [a] tendency to make a fact [of consequence] more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401. Further, other testimony and evidence reflecting Nguyen's and Milacki's relationship and dealings with Defendants was presented, so the "jury could determine that a witness who colluded with [Defendants] took the Fifth Amendment to avoid disclosing that collusion." See FDIC, 45 F.3d at 977.

Third, Defendants represent that the danger of unfair prejudice was great, and the Court erred in its application of the fourth factor in LiButti. The Court disagrees. When considering a non-party's invocation of the Fifth Amendment privilege under Fed. R. Evid. 403, many federal

courts have adopted and applied the analysis of the Second Circuit in <u>Libutti</u>.  <u>See</u>, <u>e.g.</u>, <u>Coquina</u> <u>Invs. v. TD Bank, NA</u>, 760 F.3d 1300, 1310-11 (11th Cir. 2014).  <u>Libutti</u> recognizes that the "overarching concern is . . . whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth[,]" 107 F.3d at 124, and identifies the following factors for consideration: (1) the nature of the relevant relationships, (2) the degree of control of the party over the non-party, (3) the compatibility of the interests of the party and the non-party in the outcome of the litigation, and (4) the role of the nonparty in the litigation, <u>id</u>. at 123-24.  In this case, consideration of the factors do not raise concerns about the trustworthiness of the assertion of the Fifth Amendment privilege.  Nguyen and Milacki maintained close business and social relationship with Defendants, as evidenced by their personal and business communication and their receipt of items of economic value from Defendants.  Although not employees of Defendants, evidence supports that they acted for the interests of Defendants instead of their employers and came to expect remuneration for their services.  Thus, Nguyen, Milacki, and Defendants interests are aligned in this litigation.  Nguyen, Milacki, and Defendants benefit from Nguyen and Milacki asserting the Fifth Amendment privilege as it prevents the uncovering of additional facts and evidence in this case and any criminal proceeding.  Nguyen and Milacki were also key figures in perpetrating and concealing the fraudulent overcharges, which are the basis for and cause of damages for all claims in this case.  They held positions of great responsibility and authority that could be and, as suggested by the evidence, were misused to further the conspiracy.  Therefore, the circumstances before the Court do not show unfair prejudice.  Allowing admission and an instruction on an inference will advance the search for the

truth, and the relevance of the assertion of the Fifth Amendment privilege in these circumstances is undeniable and exceeds any unfair prejudice.

### c. Deposition of Mike Dyer

Defendants WDS, Ewert, and Maier argue the admission of testimony from Mike Dyer "regarding his opinions on certain communications recovered by Plaintiffs during their investigation" was improperly admitted under Federal Rule of Evidence 701.  (Doc. No. 322-1 at 19; <u>see</u> <u>also</u> Doc. No. 323-1 at 24).  Upon consideration of the testimony, the Court finds regardless of the grounds for admissibility at trial, Dyer's testimony was not in the form of an opinion and was admissible under Rule 602, as argued by Plaintiffs (Doc. No. 340 at 25-26).  <u>See</u> Fed. R. Evid. 701.  Rule 602 of the Federal Rules of Evidence permits testimony by a lay witness on "a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

> Rule 602 . . . does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible under this rule only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to.

<u>Myrtle Beach Air Force Base Fed. Credit Union v. Cumis Ins. Soc'y, Inc.</u>, 681 F.2d 930, 932 (4th Cir. 1982).  Here, testimony and evidence established Dyer's personal knowledge of the existence and timing of communications and documentary evidence obtained and reviewed during the course of the investigation he led on behalf of Plaintiffs.  As he personally observed these documents and observed the sequence or timing of the time stamped documentary evidence and communications between Defendants and Plaintiffs' employees, Dyer could testify under Rule 602 as to the timing and sequence of the time stamped documentary evidence and communications.  His observation of the close proximity of such evidence and communication and the repeated close proximity of

such evidence and communication is therefore admissible. Although the terminology and framing of the questions by counsel could have been refined, Dyer's testimony did not go beyond the observations permissible under Rule 602.

### d. Exhibit 444

Maier's complaint that the admission of Exhibit 444 was improper because it "was not complete, contained unexplained symbols, and could not be authenticated" is unavailing. (Doc. No. 323-1 at 24). Exhibit 444 was part of an email string between Maier and Ewert. Maier's statements in the email, including her reference to going to jail, suggest her complicity in wrongdoing, including the fabrication and falsification of a contract. Although other emails in the string were produced, this email was not produced by any Defendant but was recovered forensically from Ewert's devices by Plaintiffs. As explained by Plaintiffs' counsel, the exhibit contained symbols where corruption in the data prevented recovery in the first two lines of email. At trial, Maier did not object to the authenticity of the document but argued that the document was incomplete and therefore any probative value outweighed the prejudicial effect under Rule 403. See Fed. R. Evid. 103(a) (requiring timely objection); see, e.g., Bituminous Constr., Inc. v. Rucker Enter., Inc., 816 F.2d 965, 969 (4th Cir. 1987) (denying review of objection not made upon introduction of evidence at trial). The Court concludes it was not an error under Rule 403 to admit Exhibit 444. Maier suffered no undue prejudice as she was the drafter of the email, she did not produce the email herself, and the omissions do not hinder comprehension. Further, the email is undeniably probative to this case.

### e. Testimony of Kevin Walker

Maier also objects to the testimony of Plaintiff's expert, Kevin Walker, on matters outside the scope of his qualified expertise and his personal knowledge. (Doc. No. 323-1 at 24). To the extent there was such testimony, it was in response to Defendants' questioning about matters beyond his qualifications and personal knowledge. See, e.g., United States v. Armedo-Sarmiento, 545 F.2d 785, 795 (2d Cir. 1976) ("When a defendant has been made fully aware of the response which a question is bound to elicit, he should object when the question is asked, rather than delay with the hope of inviting error and laying the foundation for a mistrial."). Further, Maier did not timely object to Walker's testimony but moved to strike part of the record after Walker left the witness stand. See Fed. R. Evid. 103(a); United States v. Vogt, 910 F.2d 1184, 1192 (4th Cir. 1990) (denying review where counsel for defendant failed to object to admission but codefendant timely objected); United States v. Martinez, 962 F.2d 1161, 1164–1166 (5th Cir. 1992) (finding failure to make timely objection precluded any appellate challenge when motion to strike was not contemporaneous with admission of testimony). Therefore, the Court stands by its ruling on the record.

### f. Conclusion

As addressed in the previous paragraphs, the Court concludes that no error occurred. Nevertheless, even if the testimony and evidence discussed herein was inadmissible, any error was harmless. On the trial record before the Court, "the judgment was not substantially swayed by the errors.'" Id. Accordingly, the Court denies Defendants' request for a new trial.

## B. Unfair or Deceptive Act or Practice[18]

---

[18] In Defendant Maier's response to Plaintiffs' request for prejudgment interest, request for attorneys' fees and memorandum of law on the UDTPA, Maier contends all of these requests should be denied for the reasons stated by Defendants Ewert and WDS and because: "(1) the requests are not governed by North Carolina law; (2) Maier did not

Plaintiffs seek a determination that the acts found by the jury constituted an unfair or deceptive trade practice as a matter of law. (Doc. No. 329).[19] An unfair and deceptive trade practice claim under N.C. Gen. Stat. § 75-1.1(a) ("UDTPA") has three elements: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) proximately causing actual injury to plaintiff. Furr v. Fonville Morisey Realty, Inc., 503 S.E.2d 401, 408 (N.C. Ct. App. 1998). The second and third elements and whether the alleged conduct occurred are fact questions for the jury. See, e.g., Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000); Kewaunee Sci. Corp. v. Pegram, 503 S.E.2d 417, 420 (N.C. Ct. App. 1998); Belk, Inc. v. Meyer Corp., 679 F.3d 146, 164 (4th Cir. 2012). Based on the jury's findings, the court then determines whether an act or practice is unfair or deceptive in the conduct of trade or commerce. See, e.g., Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).

A practice is deceptive if it has "the tendency or capacity to mislead" and unfair "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 276 S.E.2d 397, 403

---

make an unwarranted refusal to settle; (3) Maier was the prevailing party on the three of the four RICO claims asserted against her; (4) all of the attorneys' fees incurred by Plaintiffs were not in connection with claims against Maier; (5) 'Losses' as defined by the WDS-Cargill Agreements, including attorneys' fees, are not recoverable; and (6) any recovery by Plaintiffs would be less than what is sought because an award of damages against Maier, if any, must be reduced." (Doc. No. 354 at 1-2). Arguments one, five, and six have already been rejected by the Court in this Order and in its previous oral rulings. Therefore, the Court only addresses arguments two, three, and four.

[19] Defendants WDS and Ewert object to the "[t]rebling of the jury's award of $35,177,269.00 under N.C. Gen. Stat. § 75-16" because "(1) North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq. ('UDPTA') does not apply because neither Plaintiff presented evidence that it suffered any harm in North Carolina; (2) the UDPTA claim is barred by the economic loss doctrine and Plaintiffs only sought contract-based damages; (3) neither Plaintiff presented sufficient evidence to support the fraud-based claims; (4) the jury should not have been permitted to consider the RICO claim; (5) the damages assessed by the jury are erroneous, against the weight of the evidence, and a product of jury confusion; (6) the commercial bribery finding does not support the jury's award; and (7) the finding of falsification of records does not support the jury's award." (Doc. No. 342). Arguments one through five were raised by Defendants WDS and Ewert in their Fed. R. Civ. P. 50(b) and 59 motion, which have previously been addressed and rejected in this Order. Defendants' sixth and seventh argument do not address the matter before the Court, whether the conduct found by the jury is unfair or deceptive. Defendants have not preserved this argument. Therefore, it is denied.

(N.C. 1981) (citations omitted); see also Dalton, 548 S.E.2d at 711. The determination that a trade practice is unfair or deceptive "depends upon the facts of [the] case and the impact the practice has in the marketplace." Marshall, 276 S.E.2d at 403. As a result, the intent of the actor is not relevant, and the "unfairness and deception are gauged by consider[ing] . . . the effect of the practice on the marketplace" and the "consuming public." Id.

Therefore, the Court, considering the facts and the impact on the marketplace, must determine whether the jury's findings are unfair or deceptive under the UDTPA. As the jury found all Defendants liable for fraud and separately found misrepresentations of margins charged, falsified business records to further misrepresentations, and commercial bribery, in addition to other findings, the jury's findings clearly establish an unfair and deceptive trade practice. Under North Carolina Supreme Court precedent, the finding of liability for fraud alone is sufficient for the Court's finding. Sara Lee Corp. v. Carter, 519 S.E.2d 308, 311 (N.C. 1999); Bhatti v. Buckland, 400 S.E.2d 440, 442 (N.C. 1991); Hardy v. Toler, 218 S.E.2d 342, 346 (N.C. 1975); see also Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch, 80 F.3d 895, 903 (4th Cir. 1996). The "acts of commercial bribery[,]" as found by the North Carolina Court of Appeals, are also sufficient alone for the Court's finding. Kewaunee Sci. Corp., 503 S.E.2d at 420.[20] The jury's additional findings of conduct and of liability provide further support for the

[20] Defendants WDS and Ewert appear to argue that Plaintiffs' failure "to present evidence of the value of the alleged commercial bribes" and "represent[ation] that they would not seek such damages" distinguishes this case from Kewaunee. However, in reaching their conclusion, the court in Kewaunee relied on "[t]he jury f[inding] that the defendant paid Pegram in exchange for Pegram's cooperation or assistance in arranging sales and for refusing to entertain quotes or bids from other potential corrugated cardboard suppliers." 503 S.E.2d at 420. Given this finding, the court noted that commercial bribery is a crime under N.C. Gen. Stat. § 14-353. Id. The court then held "a violation of G.S. 14-353 should also be considered a violation of G.S. 75-1.1 as an unfair and deceptive trade practice." Id. Section 14-353 does not require a showing of damage or injury nor allows such a recovery. Instead, section 14-353 requires a showing consistent with the jury's finding in Kewaunee and the instructions given to the jury in this case. Thus, the Court finds no merit in Defendants WDS and Ewert's argument. The jury's finding of commercial bribery "satisf[ies] the first element" for a claim of unfair and deceptive trade practices. Kewaunee, 503 S.E.2d at 420.

Court's determination in favor of Plaintiffs. The conduct of misrepresentation and falsification of business records to further their misrepresentations is unethical and unscrupulous and demonstrates that Defendants' conduct, as implicitly found by the jury's finding of liability for fraud, had a "the tendency or capacity to mislead[.]" Marshall, 276 S.E.2d at 403 (citation omitted). Therefore, in this case, the Court finds the practice to both unfair and deceptive.

Not only do Plaintiffs, as direct consumers of Defendants' services and goods, suffer the consequences of this conduct but indirectly the consuming public, who buy products from Plaintiffs, may also be impacted. Section 75-1.1 was enacted for this purpose: to protect consumers, including businesses, by allowing a cause of action to deter conduct that may ultimately harm consumers. See Dalton, 548 S.E.2d at 710 (citations omitted); Marshall, 276 S.E.2d at 400. Additionally, conduct resulting in injury of this magnitude—over $35 million— may detrimentally alter the behavior of contracting parties that reasonably rely on the representations of other contracting parties if not checked by private actions brought under N.C. Gen. Stat. § 75-1.1. See Johnson v. Owens, 140 S.E.2d 311, 314 (N.C. 1965) ("[T]here must be a reliance on the integrity of man or else trade and commerce could not prosper." (citations omitted)). As stated by the North Carolina Court of Appeals, "[t]he purpose of G.S. 75-1.1 is to provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public within this State[,] and [it] applies to dealings between buyers and sellers at all levels of commerce." United Va. Bank, 339 S.E.2d at 93 (citations omitted). Thus, the Court allows the judgment on the verdict finding Defendants liable to Plaintiffs under the UDTPA. The Court has found as a matter of law from the findings of the jury that Defendants committed an unfair and deceptive trade practice, and the jury answered in the affirmative that

Defendants' conduct was in or affecting commerce[21] and was a proximate cause of Plaintiffs' injury. As a result, Plaintiffs are entitled to a "judgment . . . in favor of plaintiff[s] and against defendant[s] for treble the amount fixed by the verdict." N.C. Gen. Stat. § 75-16; see Marshall, 276 S.E.2d at 402 (holding that trebling is automatic); Atl. Purchasers, Inc. v. Aircraft Sales, Inc., 705 F.2d 712, 715 (4th Cir. 1983) (same). Accordingly, Plaintiffs are entitled to treble the jury verdict of $35,177,269 under N.C. Gen. Stat. § 75-16.

## C. Plaintiffs' Motion for Prejudgment Interest

Plaintiffs seek prejudgment interest on the principal amount from the date of the filing of this action, December 16, 2016, to the date of entry of judgment, January 23, 2018, in accordance with section 24-1 of the North Carolina General Statutes. (Doc. Nos. 320, 321). As North Carolina's legal rate of interest is eight percent, N.C. Gen. Stat. § 24-1, Plaintiffs seek an amendment to the judgment to provide for prejudgment interest of $3,107,164.80. (Doc. Nos. 320, 321). Defendants do not appear to dispute that Plaintiffs are entitled to prejudgment interest under North Carolina law.

The Fourth Circuit has recognized that other circuits have held that courts must apply the law of the forum to questions involving prejudgment interest in diversity cases. United States v. Dollar Rent A Car Sys., Inc., 712 F.2d 938, 940 (4th Cir. 1983) (citing Klaxon, 313 U.S. at 497;

---

[21] Some case law suggests this determination is a question for the Court. Compare Sara Lee Corp., 519 S.E.2d at 311 (deciding whether acts were "in or affecting commerce"), with United Labs., Inc. v. Kuykendall, 437 S.E.2d 374, 376 (N.C. 1993) (jury determined whether conduct was in or affecting commerce), and Kewaunee Sci. Corp., 503 S.E.2d at 420 (jury determined whether conduct was in or affecting commerce). Therefore, to the extent necessary, the Court clarifies that the conduct found by the jury was in or affecting commerce as defined under N.C. Gen. Stat. § 75-1.1. "'Commerce' includes all business activities, however denominated," N.C. Gen. Stat. § 75-1.1(b), which has been recognized by the North Carolina Supreme Court to apply to buyers and sellers in a commercial context. See Bhatti, 400 S.E.2d at 444 (citation omitted); see also Sara Lee Corp., 519 S.E.2d at 311-12. The findings by the jury, which the Court has concluded constitute an unfair and deceptive practice, all occurred in the context of the selling by Defendants to Plaintiffs in a commercial context. Accordingly, the Court affirms the jury's finding.

Clissold v. St. Louis-San Francisco Ry., 600 F.2d 35, 38-39 (6th Cir. 1979); Am. Ins. Co. v. First Nat'l Bank in St. Louis, 409 F.2d 1387, 1392 (8th Cir. 1969)).  Accordingly, this Court has concluded that it is bound to follow the law of the forum as it pertains to prejudgment interest in diversity cases.  See Legacy Data Access, LLC v. MediQuant, Inc., No. 3:15-cv-00584-FDW-DSC, 2017 WL 6001637, at *19 (W.D.N.C. Dec. 4, 2017).  The North Carolina legislature has enacted a statute governing prejudgment interest that provides "[i]n an action other than contract, any portion of a money judgment designated by the fact finder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied."  N.C. Gen. Stat. § 24-5(b).  The statute creates no exceptions or conditions and has been held "to be mandatory and not discretionary on the part of the trial court."  Hamby v. Williams, 676 S.E.2d 478, 481 (N.C. Ct. App. 2009); see also Castles Auto & Truck Servs., Inc. v. Exxon Corp., 16 F. App'x 163, 168 (4th Cir. 2001) (construing N.C. Gen. Stat. § 24-5(b) as a mandatory provision).  Therefore, the Court concludes that it is bound to award prejudgment interest on Plaintiffs' compensatory damages for its non-contract North Carolina claims for the period from December 16, 2016 to January 23, 2018, at the state of North Carolina's legal interest rate of 8%, N.C. Gen. Stat. § 24-1. The Court awards $3,107,164.80 of prejudgment interest for these claims.

## D. Plaintiffs' Motion for Attorneys' Fees and Cost

Plaintiffs seek an award of attorneys' fees and costs under (i) the indemnity provisions of the SSAs; (ii) RICO, 18 U.S.C. § 1964(c); and (ii) UDTPA, N.C. Gen. Stat. § 66-154(d).  (Doc. Nos. 325, 325-1, 338).  The Court address each herein.

### 1. Select Supplier Agreements

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008) (citations omitted). As argued by Defendants WDS and Ewert, the contract language relied on by Plaintiffs is not sufficiently clear for an award of attorneys' fees under New York law. (Doc. No. 341 at 1-3). The provision in the SSAs provides:

> . . . Supplier agrees to *indemnify and hold harmless* Cargill from any and all liabilities, losses, damages, fines, penalties, cost and expenses (including reasonable attorney fees) . . . to the extent arising from . . . any breach by Supplier (and/or Supplier Affiliate) of any of its obligations under this agreement. . . [or] any negligent act or omission, or willful misconduct of Supplier . . . .

(Doc. No. 325-1 at 3-4) (emphasis added). An agreement to indemnify "permits a party held legally liable to shift the entire loss to another" and "usually arises from an express agreement by which one party agrees to hold the other harmless for claims brought against it by a third party." Gen. Conference of Seventh-Day Adventists (Risk Mgmt. Servs.) v. AON Reinsurance Agency, Inc., 860 F. Supp. 983, 986 (S.D.N.Y. July 25, 1994), amended by, 860 F. Supp. 983 (S.D.N.Y. Sept. 30, 1994) (citations omitted); see also Atl. Richfield Co. v. Interstate Oil Transp. Co., 784 F.2d 106, 115 (2d Cir. 1986) ("[I]ndemnity agreements are generally designed only to protect against liability for damage to third parties."). This clause, with its language "to indemnify and hold harmless," addresses claims brought against Cargill by a third party. However, the contract language is not sufficiently clear for an award of attorneys' fees in this action by Cargill against the Supplier for breach of contract and other torts. Autocrafting Fleet Sols. v. Alliance Fleet Co., 148 A.D.3d 1564, 1565-66 (N.Y. App. Div. 2017) (affirming that language in indemnity provision

did not contemplate intraparty claim for breach of contract). Therefore, the Court denies Plaintiffs'
request for an award of costs and attorneys' fees against WDS pursuant to the SSAs.

## 2. Unfair and Deceptive Trade Practices Act

"[T]o encourage individuals to bring valid actions to enforce the [UDTPA] by making such
actions economically feasible[,]" United Labs., Inc. v. Kuykendall, 403 S.E.2d 104, 111 (N.C. Ct.
App. 1991) (citations omitted), aff'd, 437 S.E.2d 374 (N.C. 1993), the UDTPA provides that courts
may award reasonable attorneys' fees to the prevailing party if the court finds that "[t]he party
charged with the violation has willfully engaged in the act or practice, and there was an
unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such
suit." N.C. Gen. Stat. § 75-16.1(1). "An act is 'willful' within the meaning of N.C. Gen. Stat. §
75–16.1(1) if it is 'done voluntarily and intentionally with the view to doing injury to another.'"
Faucette v. 6303 Carmel Road, LLC, 775 S.E.2d 316, 326 (N.C. App. Ct. 2015) (quoting Standing
v. Midgett, 850 F. Supp. 396, 404 (E.D.N.C. 1993)). "The award or denial of attorney's fees under
section 75-16.1 is within the [sound] discretion of the trial judge." Barbee v. Atl. Marine Sales &
Serv., Inc., 446 S.E.2d 117, 121-22 (N.C. App. Ct. 1994) (citing Borders v. Newton, 315 S.E.2d
731, 732 (N.C. App. Ct. 1984)).

Plaintiffs, as the prevailing parties receiving damages on their UDTPA claim, argue
Defendants' acts were willful, as the jury found intentional acts and found Defendants liable for
fraud, which requires a showing of intent to deceive. (Doc. No. 325-1 at 5). Plaintiffs argue
Defendants conduct during the course of this litigation through continued concealment and
misrepresentation demonstrate Defendants unwarranted refusal to resolve the matter. (Doc. No.
325-1 at 5). Defendants do not dispute that Plaintiffs are the prevailing party or that the acts found

were willful, but they do argue that Defendants' refusal to resolve the matter was not unwarranted.[22] Defendants WDS and Ewert argue that they did not have the resources to meet the settlement demanded by Plaintiffs. (Doc. No. 341 at 3-4). Maier similarly argues she offered what she was able to pay. (Doc. No. 354 at 4). Defendants also argue they sought early mediation. (Doc. No. 341 at 3; Doc. No. 354 at 3-4). Plaintiffs in response argue that, as evidenced by the declaration of counsel Edward F. Hennessey, Defendants never made any realistic attempts to settle or fully resolve this matter. (Doc. No. 360 at 1; see also Doc. No. 345 at 3). Hennessey's declaration provides that at the mediation held on December 29, 2017, Defendants Ewert and WDS made no offer to settle, and Defendant Maier offered to settle for a total of $950,000 to be paid over ten years with a confession of judgment as security. (Doc. No. 327-5, ¶ 16). No subsequent offers were known by Hennessey. (Doc. No. 327-5, ¶ 16). Defendants have not filed affidavits to contradict Plaintiffs' declarations.

Here, the jury's findings of misrepresentation, falsification, commercial bribery, and of liability for fraud evidences willfulness. These acts, which the Court has found to be an unfair and deceptive practice as a matter of law, were voluntarily committed knowing it would injure Plaintiffs. Therefore, based on the jury's findings and the trial record, the Court finds Defendants' violation of the UDTPA resulted from a willful act or practice. Based on the Court's review of the record, the Court also concludes that there was "an unwarranted refusal by [Defendants] to fully resolve the matter which constitutes the basis of [the] suit." N.C. Gen. Stat. § 75-16.1(1). The Court finds WDS and Ewert's conduct in this litigation has been objectively deficient and dilatory for no justified reason. (See, e.g., Doc. Nos. 106, 123). As recited by Plaintiffs and

---

[22] Defendants reassert their argument that Chapter 75 does not apply because Plaintiffs did not present evidence that it suffered harm in North Carolina. The Court has already rejected this argument.

supported by the record and trial record, Maier's discovery conduct is equally blemished. (Doc. No. 360 at 5-7). Maier did not timely produce many relevant documents and never produced several relevant documents, subsequently recovered by Plaintiffs at great expense. (See Doc. No. 360 at 6-7). She also represented the authenticity of fabricated documents. (See Doc. No. 360 at 6). Further, evidence presented at trial involving all parties suggested intentional depletion of WDS's assets. The Court therefore finds WDS and Ewert did not make any offer to resolve this matter, and Maier's offer of settlement was unreasonable, especially in light of the jury's verdict of over $35 million and evidence of her receipt of $4 million in distributions from WDS in excess of her salary. The Court cannot find that in the circumstances of this case, the willingness to mediate and the inability to pay excuse Defendants from attempting to "resolve the matter which constitutes the basis of [this] suit" in whatever manner reasonably within their means, whether monetary or not, and justify Defendants' conduct impeding resolution of this matter. United Labs., Inc., 403 S.E.2d at 111 (finding that in light of the jury's award, defendant's offer of $20,000 to settle the matter was an unwarranted refusal to settle); Barbee, 446 S.E.2d at 122 (affirming award of attorneys' fees where "record [was] rife with evidence of defendant's intractability"); see generally Edwards v. West, 495 S.E.2d 920, 925 (N.C. Ct. App. 1998) (affirming award of attorneys' fees). Upon these findings of a willful practice and an unwarranted refusal to resolve the matter, the Court awards reasonable attorneys' fees under N.C. Gen. Stat. § 75-16.1 against WDS, Ewert, and Maier.

### 3. Racketeer Influenced and Corrupt Organizations Act

Section 1964(c) of Title 18 provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United

States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."  Congress, by using the language "shall," clearly established that an award of costs, including a reasonable attorneys' fee, is mandatory.  Defendant Ewert does not contest.  Yet, without citing any law or precedent, Defendant Maier argues an award under section 1964(c) is improper because she prevailed on three of the four RICO claims asserted against her.  (Doc. No. 354 at 5).  However, the plain language of section 1964(c) does not support her argument.  The only requirement for this mandatory award is injury by the defendant by reason of a violation of section 1962.  Here, the jury found Maier liable for injury to Plaintiffs under section 1962(d).  Thus, Plaintiffs "shall recover . . . the costs of suits, including a reasonable attorney's fee" against Ewert and Maier.

### 4. Reasonable Attorneys' Fees

Guided by the twelve "Johnson" factors set forth in Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 n. 28 (4th Cir. 1978), courts determine what constitutes a reasonable number of hours and reasonable rate for attorneys' fees.  Brodziak v. Runyon, 145 F.3d 194, 196 (4th Cir. 1998) (citations omitted); see also United Labs., Inc., 403 S.E.2d at 111 (making findings "as to the time and labor expended, the skill required, the customary fee for like work, and the experience or ability of the attorney" (citation omitted)).  Here, Plaintiffs seek attorneys' fees totaling $2,712,266.35.  (Doc. No. 325-1 at 2).  Defendants only object to the attorneys' fees to the extent they seek paralegal and support staff time.  (Doc. No. 341 at 5; Doc. No. 354 at 2).

After review of the declarations of attorneys Jacob D. Bylund and Edward F. Hennessey and the accompanying billing records, the Court makes the following findings and awards Plaintiffs their requested attorneys' fees after deducting fees for paralegals and support staff.  This

case was a complex case, raising unique legal questions and requiring extensive filings sometimes on short deadlines. As a result, this case required attorneys of skill and experience to expend a significant amount of time to pursue the claims. Skills commensurate with the skills of Plaintiffs' counsel were necessary. Counsel's fee rates were agreed to, billed, and paid by Cargill and CMS. Fee rates for out-of-state counsel were the ordinary and customary rate charged to their long-standing client. The hourly fees charged were within the range typically charged for complex business litigation in North Carolina. Legacy Data Access, 2017 WL 6001637, at *20 (citing In re Newbridge Bancorp S'holder Litig., No. 15 CVS 9251, 2016 WL 6885882, at *14 (N.C. Super. Ct. Nov. 22, 2016)); (see also Doc. No. 327-5, ¶¶ 7, 14). The claims in this case against all Defendants arise from the same nucleus of operative facts and are inextricably interwoven with each other.[23] Whiteside Estates, Inc. v. Highlands Cove, LLC, 553 S.E.2d 431, 467 (N.C. Ct. App. 2001). The amount in controversy and results obtained through the jury award and this order further support the requested attorneys' fees.

However, the Court cannot conclude on the record that the paralegals and support staff provided professional legal services that required a legal training or background or that the fees for the services are commensurate with fees charged for such services in North Carolina. See Irwin Indus. Tool Co. v. Worthington Cylinders Wis., LLC, 747 F.Supp.2d 568, 591, 592-93 (W.D.N.C. 2010) (declining to award fees for project assistant and only awarding paralegal fees at an hourly rate of $75); see also United States Trouser, S.A. de C.V. v. Int'l Legwear Group, Inc., No. 1:11-cv-00244-MR-DLH, 2013 U.S. Dist. LEXIS 53822, at *2 (W.D.N.C. April 16,

---

[23] Defendant Maier's objection to the attorneys' fees and request for apportionment is overruled. (See Doc. No. 354). The record and jury's findings reflect the inextricably intertwined nature of all the claims among all Defendants, whom the jury found to be co-conspirators. (See Doc. No. 360 at 3-5).

2013) ("Hours claimed by a legal secretary or legal assistant are considered overhead for the firm and are therefore not recoverable." (citations omitted)); <u>Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC</u>, No. 5:14-CV-482-BO, 2016 U.S. Dist. LEXIS 172519, at *11-12 (E.D.N.C. Dec. 12, 2016) (awarding fees for paralegals at rate of $100). This burden is on Plaintiffs. <u>See Robinson v. Equifax Info. Svcs., LLC</u>, 560 F.3d 235, 244 (4th Cir. 2009). Therefore, on this record, the Court only awards attorneys' fees totaling $2,493,796.48.

### 5. Costs

Plaintiffs also seek $698,878.30 of other costs and $40,723.23 in taxable costs under 18 U.S.C. § 1964(c). (Doc. No. 338 at 2). Defendants argue Plaintiffs' costs should be limited to taxable costs under 28 U.S.C. §§ 1920, 1821 and, as a result, exclude charges for Westlaw research, meals, e-discovery costs, and expert witness fees. (Doc. No. 341 at 4-6; Doc. No. 354 at 2). Defendants do not dispute the amount of taxable costs, which are provided for under 28 U.S.C. §§ 1920, 1821, and Local Rule 54.1. (<u>See</u> Doc. No. 338-1) Although some courts have limited costs to taxable costs, other circuits and district courts have held that non-statutory costs are allowed under RICO, which provides recovery of "the cost of the suit[.]" 18 U.S.C. § 1964(c); <u>see, e.g.</u>, <u>Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.</u>, 63 F.3d 516, 526-27 (7th Cir. 1995) (affirming award of costs and attorneys' fees that included costs of legal research, copying documents, and expert witnesses cost); Fed. Proc., Lawyers Ed., 5B Fed. Proc. § 10:283 ("A prevailing civil RICO plaintiff may recover costs beyond the statutory costs provided for by Fed. R. Civ. P. 54(d) and 28 U.S.C.A. § 1920, since the costs available to a prevailing party under 18 U.S.C.A. § 1964(c) are equivalent to those allowable in a civil rights case."). Thus, in the absence of binding precedent, the Court reads the plain language of 18 U.S.C. § 1964(c) to require the

award of costs to a prevailing party under RICO beyond taxable costs, provided the costs are necessary costs of the suit.  See generally Cherry v. Champion Int'l Corp., 186 F.3d 442, 449 (4th Cir. 1999) (finding that the concept of necessity requires something more than convenience and disallowing duplicative costs).  The Court finds the other costs requested were reasonable and necessary expenses that have been or will be billed to the clients.  Therefore, the Court hereby awards Plaintiffs' taxable costs of $40,723.23 and other costs of $698,878.30.

### E. Plaintiffs' Motion for Terminating Sanctions

On December 18, 2017, Plaintiffs moved for terminating sanctions against all Defendants and an award of damages pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure and the Court's inherent powers (the "Second Motion for Sanctions").  (Doc. No. 187).[24]  Since then, this case has proceeded to trial, and the jury rendered a verdict on January 22, 2018.  (Doc. No. 314).  Judgment was entered on January 23, 2018.  (Doc. No. 315, 316).  As this matter is now before the Court after the jury's award of all compensatory damages sought by Plaintiffs and the Court's allowance of judgment on the jury verdict in this Order, the Court denies the Second Motion for Sanctions as moot.[25]

### F. Correction of Judgment to Preclude Double Recovery

The Court must *sua sponte* correct the judgment to reflect that Plaintiffs are only entitled to one recovery for the injury underlying all their claims[26] pursuant to Rule 60(a) of the Federal

---

[24] Plaintiffs sought in the alternative an order to show cause why sanction should not be imposed on Defendants. However, Plaintiffs, and all Defendants, agreed after trial that a hearing on this pending motion was not necessary. Further, as the relief requested is moot, the request for a show cause hearing addressing the requested relief is also moot.

[25] If their request for relief is no longer moot, Plaintiffs may re-new their motion for relief.

[26] As agreed by all the parties, the Court informed the jury that the Court will use the jury's verdict to determine the judgment and will not allow a double recovery.

Rules of Civil Procedure.  See Gordon v. Pete's Auto Serv. of Denbigh, 637 F.3d 454, 460 (4th Cir. 2011); Smith v. Gulf Oil Corp., 79 S.E.2d 880, 885 (N.C. 1954).  Here, the jury awarded the same amount for each claim.  See generally Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F. Supp. 350, 358–59 (W.D.N.C. 1997) (reducing judgment to highest amount awarded by jury in verdict).  The Court also has determined that Plaintiffs are entitled to treble damages, pre-judgment interest, attorneys' fees, taxable costs, and other costs where afforded by specific claims.  Therefore, the Court amends the judgment to clarify that Plaintiffs are only entitled to recover once the highest amount of trebled damages, pre-judgment interest, attorneys' fees, taxable costs, and other costs.

### III. CONCLUSION

IT IS THEREFORE ORDERED that for the reasons explained above:

1. Defendants WDS and Ewert's "Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial" (Doc. No. 322) is DENIED.

2. Defendant Maier's "Motion for Judgment as a Matter of Law or Alternatively for New Trial or to Alter or Amend Judgment" (Doc. No. 323) is DENIED.

3. As to Plaintiffs' "Memorandum of Law on UDTPA" (Doc. No. 329), the Court concludes that the practices found by the jury were unfair and deceptive as a matter of law.  The Court allows judgment on the jury's verdict on the claim for Unfair and Deceptive Trade Practices of $35,177,269 and trebles the damages awarded by the jury pursuant to N.C. Gen. Stat. § 75-16.

4. Plaintiffs' "Motion for Award of Prejudgment Interest" (Doc. No. 320) is GRANTED. The Court awards prejudgment interest of $3,107,164.80 for each of Plaintiffs' claims of

violation of the UDTPA, conversion, fraud, and civil conspiracy to defraud or engage in commercial bribery.

5. Plaintiffs' "Motion for Award of Attorneys' Fees and Costs" (Doc. No. 325) is GRANTED IN PART and DENIED IN PART. The Court awards Plaintiffs' attorneys' fees of $2,493,796.48, taxable costs of $40,723.23, and other costs of $698,878.30 pursuant to 18 U.S.C. § 1964(c). The Court awards Plaintiffs' attorneys fees under N.C. Gen. Stat. § 75-16.1(1) of $2,493,796.48 and costs pursuant to Rule 54.1 of the Federal Rules of Civil Procedure of $40,723.23.

6. Plaintiffs' "Motion for Terminating Sanctions, or in the Alternative, for an Order to Show Cause" (Doc. No. 187) is DENIED as MOOT.

7. In accordance with the foregoing order, the Court AMENDS the judgment as follows to reflect Plaintiffs' one recovery of the following:

   a. Plaintiffs are entitled to recover $105,531,807.00 in trebled/threefold damages from WDS, Ewert, and Maier joint and several.

   b. Plaintiffs are entitled to recover $3,107,164.80 in pre-judgment interest from WDS, Ewert, and Maier joint and several.

   c. Plaintiffs are entitled to recover $2,493,796.48 in attorneys' fees from WDS, Ewert, and Maier joint and several.

   d. Plaintiffs are entitled to recover $40,723.23 in taxable costs from WDS, Ewert, and Maier joint and several.

   e. Plaintiffs are entitled to recover $698,878.30 in other costs from Ewert and Maier joint and several.

8. This results in a total judgment against WDS, Ewert, and Maier of $111,173,491.51 with an additional judgment against Ewert and Maier for other costs of $698,878.30.

IT IS SO ORDERED.

Signed: March 28, 2018

Frank D. Whitney
Chief United States District Judge